Cunningham Estate.

2

Argued May 2, 1958. Before Jones, C. J., Bell, Musmanno, Arnold, Jones and Cohen, JJ.

reargument refused April 1, 1959.

*Samuel W. Morris,* for life tenants.

*William White, Jr.,* in propria persona, with him *Thomas S. Weary,* and *Duane, Morris & Heckscher,* for trustee ad litem, and *Walter M. Burkhardt,* for trustee.

*Paul Maloney,* with him *Francis M. Richards, Jr.,* and *Pepper, Bodine, Frick, Scheetz & Hamilton,* for interested persons, under Rule 46.

*Ella Graubart,* with her *Patterson, Crawford, Arensberg & Dunn,* for interested person, under Rule 46.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, January 12, 1959:

These appeals involve a reexamination of the century-old "Pennsylvania Rule of Apportionment" with particular reference to its application to certain stock distributions made to a trustee[1] by the General Electric Company and the Gulf Oil Corporation.

Edith B. Cunningham died testate, October 11, 1933. By will she created a trust of her residuary estate and appointed as trustee the Fidelity-Philadelphia Trust Company. Under this trust two-thirds of the income is payable to testatrix' son, John B. Cunningham, for life and, upon his death, two-thirds of the principal is to be paid to his issue him surviving in equal shares per stirpes; one-third of the income is payable to John B. Cunningham's daughter, Mary E. Cunningham, for life and, upon her death, one-third of the principal is to be paid to her issue her surviving in equal shares per stirpes. Both the life tenants are presently alive. Mary E. Cunningham, unmarried, is the only living issue of John B. Cunningham. The trust further provides that, if John B. Cunningham should die without issue him surviving, the income is payable to certain named brothers and sisters of testatrix during their lives, and, upon the death of the survivor of them, the principal is to be paid in three equal shares, with stipulations as to its use, to the University of Pennsylvania, The American Oncologic Hospital of the City of Philadelphia and the Board of National Missions of the Presbyterian Church, U.S.A. All testatrix' named brothers and sisters are now dead.

---

[1] The original stock in both corporations was trustee-purchased rather than decedent-owned.

The trustee filed its third account in order that the Orphans' Court of Philadelphia could pass upon various questions relating to the possible apportionment to the income beneficiaries of gains on the sale of certain securities and on stock distributions received by the trustee from certain corporations.

The questions now presented relate exclusively to the trustee-purchased common stock of the General Electric Company and the Gulf Oil Corporation, both of which corporations have distributed additional stock to their stockholders, including the trustee. These questions are: (1) are these stock distributions subject to apportionment between principal and income to *any* extent? (2) if so, how should such apportionment be effected? The court below[2] decided that these stock distributions were subject to apportionment in a manner more fully described herein. These appeals ensued.

A brief recitation of the factual background of each stock distribution is requisite to an understanding of the problem.

### General Electric Company

On two occasions[3] during the term of the trust the trustee purchased a total of 150 shares of the no par common stock of this company. The aggregate cost was $6,935.57, and the aggregate book value as of the purchase dates was $2,403.50. In 1954 the corporation "changed and converted" its common stock by exchanging the old no par value stock which had a stated value of $6.25 per share for common stock having a par value

---

[2] The court below was divided 3-2. One judge dissented on the mechanics of the apportionment while another judge dissented on the ground that the stock distributions did not constitute apportionable events.

[3] 100 shares were purchased February 21, 1939 and 50 shares March 8, 1951.

of $5.00 per share and issuing three new shares in exchange for each old share, thus increasing the trust's holdings from 150 to 450 shares. To effect this distribution required $15.00 in the capital stock account for the three new shares issued (the difference between the par value of the three new shares [$15.00] and the stated value of the old share [$6.25] being $8.75). The new par value was arrived at by two corporate steps: (1) a "write-down" of the stated value of each old share from $6.25 to $5.00, thus making $1.25 of capital available for the "additional" new shares and (2) by transferring the balance required—$8.75—from "reinvested earnings" (earned surplus) to the capital stock account.

The court below held this "change and conversion" constituted an apportionable event and that $87\frac{1}{2}\%$ of the "additional new shares"—i.e. the ratio of the amount transferred from "reinvested earnings" to the capital stock account to the adjusted amount of capital realized from both the transfer and "write-down"— was subject to apportionment.

### Gulf Oil Corporation

On two occasions[4] the trustee purchased a total of 125 shares of the common stock of this corporation, each share having a par value of $25.00. The total cost was $8,736.50 and the aggregate book value as of the purchase dates was $8,997.96. In 1951 the Gulf Oil Corporation authorized the distribution—which it termed a dividend—to its shareholders of one additional share of the common stock of the corporation for each share of its outstanding stock, thus increasing the trust's holdings from 125 to 250 shares. To provide the new par value [$25.00] of the additional share the corporation transferred upon its books $18.549 per

---

[4] 100 shares were purchased March 14, 1949 and 25 shares March 5, 1951.

share from *earned* surplus to the capital stock account and $6.451 per share from *paid-in* surplus to the capital stock account.

The court below held that, inasmuch as the corporation had transferred on its books from earned surplus to capital stock account approximately 75% of the par value of the new shares, therefore approximately 75% of the new shares received by the trustee was subject to apportionment.

Atlhough General Electric refers to the distribution as a "change and conversion", while Gulf Oil refers to it as a "stock dividend", it is important to note that both transactions were essentially the same in that the par value of the new stock issued was in part supplied by a transfer of earnings to the capital stock account. In both instances, the life tenants rely upon this capitalization and alleged removal of earnings as a source of future dividend payments as justification for an apportionment. This fact was recognized by all the judges of the Orphans' Court of Philadelphia County and we believe by all counsel, all of whom agreed on the facts although differing as to the results which legally flowed therefrom.

Our initial inquiry must be to determine whether these stock distributions constitute events or occasions which, under the "Pennsylvania Rule of Apportionment", require an apportionment of such stock between the life tenants and the remaindermen. The basis of the ruling in the court below was that whenever corporate earnings are capitalized to support the issuance of new shares of stock, whether such shares be issued in exchange for outstanding shares, or as a dividend on outstanding shares, an apportionment *must* be made.

This inquiry begins with the recognition that the "Pennsylvania Rule of Apportionment" has been abrogated by the Uniform Principal and Income Act of

May 3, 1945,[5] subsequently repealed but substantially re-enacted by the Principal and Income Act of July 3, 1947,[6] as to all trusts created subsequent to the dates of such legislation. The Rule's application is now limited to trusts created before the effective dates of such statutes: *Crawford Estate*, 362 Pa. 458, 67 A. 2d 124; *Warden Trust*, 382 Pa. 311, 115 A. 2d 159; *Steele Estate*, 377 Pa. 250, 103 A. 2d 409; *Pew Trust*, 362 Pa. 468, 67 A. 2d 129; 99 U. Pa. L. Rev. 864, 865. In view of this legislative declaration of a public policy contra the Rule shall we, as to trusts created prior to such legislation, extend the Rule beyond the point it had reached when such legislation became effective?[7] Shall that which had not been judicially determined to be an occasion or event for apportionment be *now* held such occasion or event, or shall the application of the old Rule be restricted to only those situations judicially recognized as apportionable events or occasions prior to the legislative abrogation of the Rule?[8]

An examination of all the decisions of this Court on the subject of apportionment indicates that the Rule was applied and apportionment decreed *only* in the following situations: "(1) the distribution by the corporation of an extraordinary cash or stock dividend, or (2) the liquidation of the corporation, or (3) a sale of the stock by the trustees, or (4) the issuance of stock rights [citing cases].": *Jones Estate*, 377 Pa. 473, 476, 105 A. 2d 353, 354. In *Buist's Estate*, 297 Pa. 537, 147 A. 606, we said: "The life tenant is not entitled to

[5] P.L. 416, 20 PS §3471.

[6] P.L. 1283, 20 PS §3470.

[7] See: *Estate of Henry Fera*, 26 N.J. 131, 139 A. 2d 23, wherein the Supreme Court of New Jersey was faced with substantially the same problem.

[8] Amicus curiae aptly argues that "while the legislature cannot turn back the clock", it can "stop the clock".

any division *until* (1) the increased value is declared
as a cash dividend, or (2) distributed in the form of a
stock dividend, or (3) the affairs of the [corporation]
are wound up so that assets are distributed to those
entitled to receive them, or (4) there is a sale of this
stock so that the connection of shareholder is entirely
severed".[9]   See also: *Crawford Estate*, 362 Pa. 458,
461, supra.   In no instance has this Court *expressly*
restricted the Rule's application to these specific situa-
tions.   However, in point of fact, we have never ap-
plied the Rule to other than the above enumerated situ-
ations.   Moreover, we have expressly held that a merger
even though it involves a capitalization of earnings and
the issuance of new and different par value shares was
not an apportionable event: *Jones Estate*, 377 Pa. 473,
105 A. 2d 353.   The instant stock distributions pre-
sent a situation of first impression in this Court.

The auditing judge found the existence of an appor-
tionable event by concluding that when this Court *said*
that a "stock dividend" constituted an "apportionable
event", we *meant* that "when new stock is issued to
existing stockholders and the new stock is supported
by a capitalization of earnings, that to the extent of
such capitalization of earnings, there is an apportion-
able event".   The Court en banc regarded the stock
distribution *"in the nature of stock dividends"* because
earnings had been capitalized and held that "an appor-
tionment is to be made whenever, independent of a cor-
porate merger, earnings or earned surplus are capi-
talized to support, in whole or in part, the issuance of
new shares . . ."   The court below concluded the Rule's
application to the instant stock distributions did not
*extend* the Rule since the transactions could be con-
sidered "stock dividend" events.

----

[9] *Waterhouse's Estate*, 308 Pa. 422, 428, 429, 162 A. 295.

The basic question is whether an apportionment *must* be made *whenever* corporate earnings are capitalized to support the issuance of new shares.

The rationale of the Pennsylvania Rule from its very inception (*Earp's Appeal*, 28 Pa. 368, 374) has been that a *life tenant should not be deprived of earnings which were accumulated since his ownership merely because the corporation decided to declare them in some form other than cash*. The logical and essential fairness of apportioning a stock dividend or stock rights which represent accumulated earnings is readily apparent and sustainable. Furthermore, it is entirely consistent to hold that an apportionable event takes place when the stock is sold or the corporation liquidated because such events represent the only and last opportunity for a life tenant to share in any corporate earnings accumulated since creation of the trust. To hold, however, that *any* capitalization of corporate earnings followed by a stock issuance or stock exchange is an event requiring an apportionment marks a far departure from the original concept which gave birth to the Rule.

To warrant an apportionment it must be shown that there are corporate earnings (since acquisition of the stock) *plus* an apportionable event. We have treated as apportionable only the following events: the liquidation of the corporation,[10] the distribution of a stock dividend,[11] the distribution of an extraordinary cash or scrip dividend,[12] sale of the stock itself,[13] the sale

---

[10] *Connolly's Estate (No. 1)*, 198 Pa. 137, 47 A. 1125; *McKeown's Estate*, 263 Pa. 78, 106 A. 189.

[11] *Earp's Appeal*, 28 Pa. 368.

[12] *Nirdlinger's Estate (No. 1)*, 327 Pa. 160, 193 A. 33; *Mandeville's Estate*, 286 Pa. 368, 133 A. 562; *Flaccus's Estate*, 283 Pa. 185, 129 A. 74.

[13] *McKeown's Estate*, supra; *Nirdlinger's Estate*, 290 Pa. 457, 139 A. 200.

or the exercise of rights to subscribe to stock[14], and the distribution of extraordinary stock dividends even though such dividends are paid in stock of another corporation.[15]

In *Jones Estate*, 377 Pa. 473, 105 A. 2d 353, we were presented with the problem of whether an apportionable event arose from the merger of the Union Trust Company of Pittsburgh and the Mellon National Bank and Trust Company plus the concomitant capitalization of over $58,000,000 of earned surplus. Prior to that merger the Union Trust Company had a capital stock account of $1,500,000 and an earned surplus of $108,-500,000 and the Mellon Bank had a capital stock account of $7,500,000 and an earned surplus of $40,000,-000. To accomplish the merger the capital stock account of the new corporation was increased to $60,100-000 from $1,550,000 and it became necessary to transfer from earned surplus to the capital stock account $58,550,000. For each share of stock held the Union Trust Company stockholders received 8 shares of stock of the new corporation and the stock of the Mellon National Bank and Trust Company held by Union Trust Company was cancelled. The earnings capitalized were less than the earnings accumulated by the Union Trust Company between the date of decedent's death and the merger date. Our denial of the occurrence of an apportionable event was not based simply on the existence of a merger as the court below indicated. Appellant's argument in *Jones Estate*, supra, was exactly the same as the position taken by the Orphans' Court in the instant case, namely that "the true test of whether an apportionable event occurs in a given situation is whether the transaction results in the capitalization

[14] *Hostetter's Trust*, 319 Pa. 572, 181 A. 567; *Jones v. Integrity Trust Company et al.*, 292 Pa. 149, 140 A. 862.

[15] *Barnes Estate*, 338 Pa. 555, 12 A. 2d 912.

of any earnings in one form or another. If such is the result, there must be an apportionment". We rejected this contention and in our determination that no apportionable event had occurred we said: "While there was no capitalization of surplus . . . in that merger [Buist's Estate, 297 Pa. 537] that fact cannot change the principle there established". (p. 478).

Present day economic conditions, particularly in the corporate field, present a drastic contrast to the economic conditions in existence at the inception of and during the formative years of the Rule, and corporate practices plus multiplication and extension of taxes has made the application of the Rule even more difficult and often unworkable. The complexities, the uncertainties, and the difficulties which are inherent in the application and administration of the Rule have too often in these modern times created confusion, injustices and glaring inconsistencies. The essential fairness and equity of the Pennsylvania Rule was beyond question.[16] The basis for its rejection and abandonment by legislation is the fact that changes in corporate practice have, in many instances, rendered unworkable the Rule. In recent years the ingenuity of corporate management, seeking to achieve various ends such as broadening or enhancing the market for its stock, effect tax savings, etc., has produced a complexity of corporate transactions which involve the transfer on corporate books of earnings, earned surplus, etc., from one account to another. Earnings, under modern corporate practice, no longer retain the simplicity of meaning of the earnings considered by this Court in *Earp's Appeal,* supra, and other decisions.[17]

---

[16] "It is a rule designed to achieve as nearly as possible exact justice between the successive interests, irrespective of the difficulty of its application": *Estate of Henry Fera,* supra, p. 136.

[17] "There is a serious question as to whether corporate earned surplus should have the sacred meaning ascribed to it by the great

The general rule in a corporation-shareholder relationship was well expressed in *Green et al. v. Philadelphia Inquirer Company et al.*, 329 Pa. 169, 175, 196 A. 32: "Stockholders are not entitled to the earnings as such of a corporation. A corporation is an entity separate and distinct from its stockholders and a dividend declaration is necessary to create in the stockholder any ownership or other property right in the earnings. Where the owner of corporate stock dies leaving a will whereunder the stock is given to one person for life, with remainder to another person or persons, he does not thereby create any larger property rights as a stockholder in any of his beneficiaries than he himself had". The Rule is an exception to this general rule in that the stockholder is considered to have an ownership in the earnings of the corporation accumulated since the date of the creation of the trust and possession by the stockholder of such earnings awaits *only* the happening of an apportionable event.[18] The sole justification for this exception must rest upon the theory that that which corporate management labels as reinvested earnings, earnings, earned surplus, etc., is actually corporate income which has been earmarked and set aside *solely* for eventual distribution to the shareholders.

mass of apportionment decisions. Instead, there should be room for the concept that accumulated surplus is less an income retention than it is a vehicle to replace capital equipment at constantly increasing costs, thereby assuring future income which otherwise might be lost to the life tenant": Legal, Tax and Accounting Aspects of Fiduciary Apportionment of Stock Proceeds—The Non-Statutory Pennsylvania Rules, Cohan and Dean, 106 U. of Pa. L. Rev. 157, 205, 206.

[18] "One difficulty with the argument is that no court has been willing to follow it to its ultimate logical conclusion, and to treat the earnings of the corporation as for all purposes income to the shareholders. The rule is generally applied only when the earnings are distributed by the corporation among the shareholders in the form of a dividend": Scott on Trusts, Vol. 2, §236.3, p. 1302 (1939).

Under modern corporate methods, however, such accounts may be and are set up for various and sundry reasons, for example, to cover future expansion, cost of equipment, future contingencies or reserves for losses in business, etc. and that which is labelled "earnings" may and often does represent items other than income, such as capital gains.

The Rule holds that upon distribution of corporate earnings in one of the above mentioned forms, a life tenant is entitled to receive the earned net income of a corporation which has accumulated since the stock was acquired, except where it is necessary to preserve the intact value of the principal. The Rule's application requires that the fiduciary, upon the happening of an apportionable event, determine the source from which distribution was made, whether such source consists of actual earnings or profits of the corporation earmarked solely for distribution to stockholders and how much of said earnings or profits have accumulated since the creation of the trust.[19]

The fiduciary is required in each instance to make a full and complete study and investigation of the entire corporate background and to scrutinize all the corporate transactions at the cost of considerable time and trust money. Even if the fiduciary performs such

---

[19] "Any trustee who has to decide such a question must indeed be puzzled. If he tries to make a decision on his own account, he will have to spend a great deal of time and some trust money in getting the corporate history of the organization issuing the stock . . . and taking the advice of experts. He runs the danger of making a decision which may lay him open to liability at the hands of either L [life cestui] or R [remaindermen]. In cases of importance, litigation to get the opinion of the court will be almost a certainty. No precedents will help in deciding such a question. Each case will be different. The gain to both life cestui and remaindermen may well be eaten up in court costs and lawyers' fees." 4 Bogert, Trusts and Trustees, §824, p. 273 (1948).

a duty its eventual decision too often has to be made on an arbitrary and speculative basis. To include the present type of stock distributions within the orbit of apportionable events would add chaos to an already chaotic condition. Whether we label the new stock distributions as being "in the nature of stock dividends" or not, to hold that they constitute apportionable events would be to extend the Rule's application, an extension clearly without justification in the present state of the law.

This Court, which created the Rule, should be the first to acknowledge its unworkability, inconsistencies and inequities in many instances under modern economic conditions. Parental defense of a child is justified only to the extent that the child's conduct is defensible. The language of the Supreme Court of New Jersey in *Estate of Henry Fera*, supra, 142 is most apposite: "It is indeed small consolation to either the life *cestui* or remainderman that equity has apparently been served, if the ultimate result of the endeavor is to substantially reduce the net gain available to the trust estate and the final determination of the respective equities of the parties is founded as much upon speculation and guesswork as it is upon fact. These factors together with the increasing complexity of corporate structures and accounting methods, which progressively makes more difficult and costly an accurate analysis of the past financial history of a corporation, are practical realities that persuade us to reject the [Rule] . . ."

The practicalities of the situation, the historical restriction by our Court of the application of the Rule to certain specific situations other than are here present, and the legislative enunciation of a public policy contra the Rule preclude its extension to cover the instant stock distributions.

Decree reversed. Costs on the estate.

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE BELL:

*Cunningham Estate* and *Harvey Estate* are test cases, and since on several points they are inextricably intertwined, they will on those points be considered together. They involve the application and clarification of the Pennsylvania equitable doctrine or Rule of Apportionment as applied to stock distributions which were made by several corporations to testamentary trustees which own, respectively, (a) trustee-purchased, and (b) decedent-owned common stock.

More particularly there are two main questions involved: (1) Are any or all of these stock distributions apportionable between life tenant and remaindermen, and (2) if apportionable, what are the correct measuring rods which are applicable?

Since the constantly changing corporate financing, corporate accounting and complex corporate practices have caused such widespread confusion* in the application of the apportionment rule, it would seem appropriate and wise to analyze and review the basic reason for, and the paramount purpose of, the rule, as well as various prior decisions of the Court which are in some respects irreconcilable.

### General Electric Company

The testamentary trustee purchased 150 shares of the *no par* common stock of the General Electric Company for an average *cost*** of $46.24 per share, or a total of $6935.57. Each share had a *"stated value"* of $6.25 per share. The *book value* of each share held in

---

* See infra.

** Every stock broker, every banker and nearly every frequent purchaser of stocks knows that the *cost* of stocks listed on the New York Stock Exchange and other stock exchanges is almost always the same, at the dates they were purchased, as "market value".

this trust was $16.02 per share as of the purchase dates, or a total book value of $2,403.50.

In 1954 the company split its stock 3 for 1 in order to broaden the market for its stock, i.e., reduce its market value, in order that it could be purchased by many of its employees and by persons with moderate means, as well as for tax savings and other corporate purposes. In order to accomplish this change, the company "changed and converted" its no par common stock into common stock having a par value of $5 per share, and issued 3 new shares for each old share. This increased the holdings of the Cunningham Trust Estate from 150 shares of *no par* common to 450 shares of common, having a *par value of $5* per share. To validly accomplish this stock split and effect this change, the Company was required by law to amend its charter, and to have *a capital* equal to $5 per share. The Company effectuated this legally, (1) by a "write-down" of the *stated value* of each no par share from $6.25 to $5.00, thus making $1.25 of capital available for the two new shares, and (2) by transferring the balance of $8.75 from earned surplus to capital.

It is clear and indisputable that this was not a stock dividend. The orphans' court believed "it was in the nature of a stock dividend". While it was not a simple pure stock split, it was more nearly a stock split than a stock dividend. It was, we repeat, denominated by the Company as a "change and conversion"; and the reasons and purposes were set forth by the Company in its notices to its stockholders. As the Company further stated: "each share of the Company's present Common Stock without par value *will automatically be converted*\* into three shares of Common Stock having a par value of $5 each". The Company did not

---

\* Italics throughout, ours.

consider or intend this "change and conversion" to be a stock dividend, it was intended to be (a) a change from no par value stock into $5 par value stock, and (b) the conversion of one share into three; and what the Company called it is prima facie evidence of what it was. What an Act, or a contract, or a transaction is termed by the parties is prima facie evidence of what it is, but actualities and realities determine its real nature, and, if inconsistent with nomenclature or labels, prevail. Especially is this so in Equity, because Equity looks through the form and bases its decision upon the substance: *McKeown's Estate,* 263 Pa. 78, 84, 106 A. 2d 189; *Nirdlinger's Estate,* 290 Pa. 457, 472, 139 A. 2d 200; *Murray v. Philadelphia,* 364 Pa. 157, 71 A. 2d 280; *Armour & Co. v. Pittsburgh,* 363 Pa. 109, 69 A. 2d 405. However, in this case the nomenclature fits the facts, and the actualities and realities further demonstrate that this was in reality a stock split, not a stock dividend.

The question then arises: When there is a stock split, as distinguished from a stock dividend, and it is accomplished wholly or, as in this case, in part, by a transfer of money from earned surplus to capital, does this capitalization of earnings require an apportionment between principal and income, and if so, what are the measuring rods to determine how much is allocable to income and how much to principal?

It will, we believe, aid in a solution of these questions and clear up much of the prevailing confusion if we first discuss the origin and the basic reason, object and purpose of the Rule of Apportionment, as well as the difficulty of applying it to modern conditions and various modern complex corporate practices, and then analyze and review many of the cases.

The Pennsylvania Rule of Apportionment had its origin in *Earp's Appeal,* 28 Pa. 368 (1857). This was

the beginning of the *equitable* doctrine—which was followed in Pennsylvania for nearly one hundred years until changed by the Legislature in 1945*—that a life tenant is entitled to the net earnings of a company which are paid out in dividends,** irrespective of whether the dividend is in cash or in stock or in other forms of property, provided such net earnings had accumulated since the testator's death,*** (or since the acquisition of the stock if trustee-purchased) and provided that the "intact value", i.e., book value, adjusted (whenever necessary) for capital increases and capital losses, was not impaired: *Nirdlinger's Estate*, 290 Pa. 457; *Packer's Estate (No. 1)*, 291 Pa. 194, 139 A. 867; *Waterhouse's Estate*, 308 Pa. 422, 162 A. 295; *Arrott Estate*, 383 Pa. 228, 118 A. 2d 187, as to decedent-owned stock; *McKeown's Estate*, 263 Pa. 78, as to gains on sale of stock.

In *Arrott Estate*, 383 Pa., supra, the Court said (pages 230, 231): "The basic reason for the rule of equitable apportionment is that a life tenant is entitled to accumulated corporate profits and earnings on stock *when* it is sold, distributed, stock dividends declared, or the stock with accumulations is otherwise dealt with. The justness of the rule cannot be questioned. The difficulty is in its application.

"In King Estate, 349 Pa. 27, 29, 36 A. 2d 504, it was stated by a unanimous court: . . . '*In general*, it is the rule that *on distribution* a life tenant is entitled

---

* The Acts of May 3, 1945 and July 3, 1947 apply only to trust estates thereafter created: *Crawford Estate*, 362 Pa. 458, 67 A. 2d 124; *Pew Trust*, 362 Pa. 468, 67 A. 2d 129; *Warden Trust*, 382 Pa. 311, 115 A. 2d 159; *Steele Estate*, 377 Pa. 250, 103 A. 2d 409.

** This equitable doctrine was subsequently extended and applied to stock rights as well as to gains on the (a) sale and (b) liquidation of stock.—See infra.

*** Except for ordinary dividends.

to receive accumulated profits and earnings, except where necessary to preserve the "intact value" of principal. Where there is a stock or cash dividend, a corporate liquidation, a sale or distribution in kind, the life tenant is entitled to such accumulated profits and earnings. It is wholly immaterial in what form such accumulations appear.' "

In other words, the primary and paramount object and purpose of this judicially devised doctrine or rule was to protect a life tenant from being deprived of his equitable share of such dividends* merely because the dividends were paid in stock or in other kinds of property instead of in cash.

In *Packer's Estate (No. 1)*, 291 Pa. 194, supra, which involved (a) the apportionment of an extraordinary stock dividend and (b) a gain on the sale of securities, the Court said (pages 196, 197) : "While Mrs. Thomas, the life tenant, was still alive, an extraordinary stock dividend was declared. The court below awarded to her *only so much thereof as in fact represented income.* Appellant, the administrator of her estate, claims that, as the market value of the stock was the same after the dividend was declared as it had been before, the whole of it should have been awarded to her, as life tenant. Whether or not this is correct, is the first question raised on the present appeal. After the death of the life tenant, certain of the trust securities were sold, at a price in *excess of the appraisement* as above made. The court awarded nearly all of the proceeds to the remaindermen. Appellant claims that the whole of it should have been awarded to him, as her administrator; that the profit thus realized was in legal effect income, though it was not earnings of

---

* This equitable doctrine was subsequently extended and applied to stock rights as well as to gains on the (a) sale and (b) liquidation of stock.—See infra.

the corporations accruing after testator's death. Whether or not this is correct, is the only other question raised on the present appeal. The court below was right on both points. . . . We there held [in Nirdlinger's Estate, 290 Pa. 457, 139 A. 200] that, in distributing extraordinary stock dividends between a life tenant and the corpus of a trust which holds the original stock upon which the dividend is declared, the former is entitled to receive *so many of the new shares as represents the net earnings* of the corporation accruing after the trust estate acquired the stock upon which the dividend was declared, for they then represent the accrued income; the *latter is entitled to retain all the rest of the stock dividend, for it does not represent income. Neither market value, nor any other value than the actual or intact value [i.e. book value] of the shares, is of any moment in determining how such a distribution is to be made.* In making it, there should always be awarded to the corpus of the trust such a number of the shares included in the dividend as, with the shares upon which the dividend was declared, at the actual or intact value [i.e. book value] of the two *after* the stock dividend is declared and paid, will aggregate exactly the same sum *as the* actual or *intact value* of the *original* shares at the time the trust acquired them, *plus any capital increase* thereafter paid to the corporation on account of those shares, and less a proportionate part of any capital losses properly chargeable against them.

"In Nirdlinger's Est., supra, we also held that on a *sale* of the securities in a trust estate, *the income included in the purchase price,* measured in the way above stated and in that way only, belongs to the life tenant, *and any other enhancement in value is not income, and hence belongs to the corpus.* If we were to hold otherwise, it could equally well be said that an increase in

the value of trust realty, owing to a shifting of population or business, is income of the estate."

In *McKeown's Estate*, 263 Pa. 78, supra, the question arose as to whether the proceeds of the sale of stock, which was made in conjunction with the dissolution of the Pure Oil Company, were apportionable, and if so what was the measuring rod or measuring rods. The Court extended the rule governing the apportionment of extraordinary dividends to sales of stock in liquidation of a company, and said (page 83) : ". . . at the time of testatrix' death the *book* value of the common stock was $12.22 per share; its *book* value when the 1,760 shares were sold was $12.29 per share; and its *book value* at the time of the final sale [of 4000 shares] and liquidation of the Pure Oil Company was $15.18 per share.

". . . It is clear, therefore, that the assets of the company, at the time of the sale of the 1,760 shares, had increased, after testatrix' death, to the extent of seven cents per share, owing to an accumulation of income; and that at the time of the sale of the other 4,000 shares, and the liquidation of the company, the assets had increased, after testatrix' death, to the extent of *$2.96 per share, owing to an accumulation of income.* It is also clear that *the difference between the book value of $15.18* per share, at the time of the final sale and liquidation of the company, and the $24.50 per share, [sales price] realized at that time, *is not income.* For this latter reason the claim of appellant that that difference should be considered as income, and divided among the sons, must be overruled, . . ."

Did this "change and conversion" of General Electric Company stock from *"no par"* to *"$5 par"* and the *"automatic conversion"* of one share of no par into three shares of $5 par constitute an apportionable event? The General Electric Company "change and

conversion" was neither an ordinary nor an extraordinary dividend; it was, we repeat, in reality a stock split; and it was *not* an apportionable event. There are four controlling reasons for this conclusion.

(1) Never in 100 years has the stock split and exchange, which occurred in the General Electric Company case, been considered by the Courts to be an apportionable event. While this is not conclusive, it is persuasive that a life tenant should not, under such circumstances, be entitled to an apportionment.

(2) This Court has set forth with particularity—in *Buist's Estate*, 297 Pa. 537, 147 A. 606; *Waterhouse's Estate*, 308 Pa. 422, 162 A. 295; *Neafie's Estate*, 325 Pa. 561, 191 A. 56; *King Estate (No. 2)*, 355 Pa. 64, 48 A. 2d 858; *King Estate (No. 1)*, 349 Pa. 27, 36 A. 2d 504; and again in the recent case of *Jones Estate*, 377 Pa. 473, 105 A. 2d 353—*those events* which entitle a life tenant to a division and apportionment of net earnings which have accumulated since the trust's acquisition of the stock. In *Jones Estate*, supra, the Court said (page 476) : "Such an apportionment can and should be made upon the happening of any one of four events, namely, (1) the distribution by the corporation of an extraordinary cash or stock dividend, or (2) the liquidation of the corporation, or (3) a sale of the stock by the trustees, or (4) the issuance of stock rights: King Estate (No. 2), 355 Pa. 64, 65, 48 A. 2d 858; King Estate, (No. 1), 349 Pa. 27, 36 A. 2d 504; Buist's Estate, 297 Pa. 537, 147 A. 606; Earp's Appeal, 28 Pa. 368; Nirdlinger's Estate, 290 Pa. 457, 139 A. 200; Mallory's Estate, 285 Pa. 186, 131 A. 714; Waterhouse's Estate, 308 Pa. 422, 162 A. 295; Jones v. Integrity Trust Co., 292 Pa. 149, 140 A. 862."

While these cases did not expressly state that those were the *only* apportionable events—since it is very difficult to visualize all the possible forms of distribu-

tion which in these modern times can be made by a corporation*—the fact (a) that the apportionable events were repeatedly "spelled out" in our recent decisions, and (b) that no apportionment has ever been made in a situation such as the present, is persuasive that Courts should not now hold this to be an apportionable event.

(3) Public policy. The equitable Pennsylvania Rule of Apportionment existed in this Commonwealth from 1857 until it was abolished by statute in 1945. It was followed by Courts in many of our sister States, but, like Pennsylvania, nearly all of these States have abolished the Rule either by statute or by judicial decision. Moreover, the Pennsylvania Apportionment Rule was abandoned in 1947 by the Restatement, Trusts, and in lieu thereof the Massachusetts Rule was adopted.

Because of the widespread disagreement and confusion as to the application of the Rule,**—even after one

---

\* The life tenants have overlooked the fact that because corporate financing, corporate accounting and corporate practices have changed quite frequently (and at times become complex) during the last hundred years, and because of a corporation's desire to avoid or eliminate taxes (whenever possible), what in the early days was a simple extraordinary stock dividend (or a change in, or a distribution of surplus) gradually took diverse and multiple forms. The net result has been that the ascertainment of what was *equitably* income and what was principal—as between life tenant and remainderman—in other words the *application* of the *equitable* Rule of Apportionment in connection with the distribution by a corporation of its property in a form other than cash, often became difficult.

\*\* This is manifest from the cases at bar and the recent kindred case of *Trimble's Estate*, as well as from a careful analysis of many prior decisions of this Court (some of which are reviewed hereinafter) which will disclose widespread disagreement, confusion and conflict. For example, in *Cunningham Estate*, three Judges

hundred years of study—and because the determination of the apportionment became so costly to the trustee* and so wasteful to the beneficiaries of the estate,** the Pennsylvania Legislature wisely abolished the Pennsylvania Rule of Apportionment in 1945, and in 1947 prescribed an entirely different and easily workable Rule of Thumb sometimes called the Massa-

---

of the Orphans' Court of Philadelphia County reached one conclusion, one Judge reached a different conclusion, another Judge reached a still different conclusion; and the learned Judge JOHN FREMONT COX of the Orphans' Court of Allegheny County applied a different yardstick and reached still another conclusion in his comprehensive 94 page opinion in the very recent case of *Trimble Estate*. Moreover, the auditing Judge in *Harvey Estate*, using only book value as a base, laid down a simple formula for determining distribution of a stock dividend. After exceptions, he changed and (still based on book value) laid down a different and complex formula. Based solely on book value, counsel have suggested 6 different solutions (which they called mathematical formulas) for apportioning an extraordinary dividend. If market value, or a combination of book and market value are used, the possible solutions which can be urged will be more than doubled. For other recent examples of disagreement as to the application of the Rule, see the opinions of this Court in *King Estate (No. 2)*, 355 Pa. 64, and *King Estate (No. 3)*, 361 Pa. 629. Furthermore, attorneys who specialize in trust estates, and trust companies throughout the State, very frequently and widely disagree among themselves as to the application of the Apportionment Rule.

* One trust company in Philadelphia employs several persons who do nothing but attempt to apportion stock dividends and other apportionable income; many other employees and officers spend part of their time in resolving apportionment problems. The magnitude of the problem is apparent from the fact that Standard & Poor's Corporation lists over 900 stock distributions by industrial corporations in 1956 and 1957. (It is virtually impossible for an individual trustee to apply it.)

** The cost of court accounting and counsel fees, particularly the fees paid to guardians and trustees ad litem are, compared with the amount involved, often tremendous.

chusetts Rule.* It seems unwise to *now extend* the old Rule (a) because it flies in the teeth of the public policy of this State** and (b) because an extension of the Rule, which in its application has caused so much confusion and has become so costly, would merely *add* to the confusion and cost.

(4) In order to hold this stock split to be an apportionable event, we would have to repudiate the reasons and the basis for this Court's recent decision in *Jones Estate*, 377 Pa. 473, supra. That this is so, is manifest from an analysis and review of that case.

In *Jones Estate* testator at the time of his death owned 22 shares of the ($100 par value) common stock of the Union Trust Company. Subsequently the Trust Company reduced the par value of its shares from $100 a share to $20 a share, and exchanged the stock on a 5 for 1 basis. The trustees thereupon became the owner of 110 shares of $20 par value common stock of the Union Trust Company. This Court agreed with all the parties involved, that this transaction did not create an apportionable event.***

Thereafter, the Union Trust Company merged with the Mellon National Bank, as a result of which the trustees received *880* shares of common stock of the new bank, each share having a *par value of $100* per

---

* See *Crawford Estate*, 362 Pa. 458, 462. The Act provides that if the testator prefers, he may make different provisions in his will, and his directions prevail.

** And, I believe, of the testator's intent. I venture the guess that over 95% of testators who give to a life tenant the income from their trust estate wish and intend income to mean "dividends" (and bond interest and rents) and do not wish or intend their life tenants to receive, as if they were dividends, earnings which the corporation in good faith decides to capitalize for legitimate corporate purposes, instead of distributing them as an extraordinary dividend.

*** See *Buist's Estate*, 297 Pa. 537, 147 A. 606.

share, in exchange for the *110* shares of the Union Trust Company stock (having *a par value of $20* a share) which the trustees had previously owned. The intact (i.e., book) value of the shares held by the trustees at the date of decedent's death was $4,981 a share. The intact-book value *after* the merger was undisclosed but was *considerably higher*. As part of the merger, $58,-550,000 was transferred *from earned surplus* to capital. *The increase in the surplus* of the Union Trust Company and of the Mellon National Bank from the date of testator's death until the date of merger (from January 1, 1928 until September 26, 1946) *represented accumulated and undistributed earnings* of the merging institutions and was not the result of capital contributions or other capital increases. The parties agreed that if the merger created an apportionable event, the trustees would be entitled to retain 371 shares as principal and 509 shares of stock should be awarded to the life tenant. This Court was unanimously of the opinion that these facts, namely, a merger, *a capitalization of accumulated earnings, and an accompanying distribution of additional stock,* did not constitute an apportionable event.

The life tenants contend, and a majority of the orphans' court decided that there should be an apportionment in General Electric *because (a) there was a capitalization of earnings and (b) an accompanying distribution of stock based in part thereon.* Exactly the same situation arose, and exactly the same contention was made by the life tenants and was rejected by this Court in *Jones Estate.*

This Court said (page 476) : "The Pennsylvania Rule of Apportionment between a life tenant who was entitled to income and a remainderman who was entitled to principal was based on the equitable theory that profits and earnings of a corporation which were

made, accumulated and undistributed since testator's death (or since the acquisition of the stock when it was acquired subsequent to his death) were income to which the life tenant under certain circumstances and upon proper occasions was entitled. . . .

"Appellants now seek to have the Rule of Apportionment extended and applied to cases where a merger occurs and *surplus and undivided profits are capitalized** as part of the merger. We find no reason or authority or justification for such an extension.

"The instant case is ruled by Buist's Estate, 297 Pa., supra, King Estate, 349 Pa., supra, and King Estate, 355 Pa., supra.**

"The facts in Buist's Estate, 297 Pa., supra, are almost on all-fours with the facts in the instant case. In that case trustees held 200 shares of stock in a bank which, with several other banks, was merged into the Philadelphia National Bank. As a result of the merger the trustees received 200 shares of stock of the Philadelphia National Bank. The *book or intact value** of the new stock *exceeded* by $11,000 the *book or intact value** of the original shares of stock owned by testator at the time of his death. The life tenant claimed that this excess [of $11,000] was income payable in stock or cash and immediately distributable to her. This Court rejected her claim and said (pp. 541, 542, 543): *'The merger of two or more corporations is neither a*

---

* Italics throughout, we repeat, ours.

** Mr. Justice (now Chief Justice) JONES concurred "in the result on the ground that the disposition of this case is directly controlled by the ruling in Buist's Estate, 297 Pa. 537, 147 A. 606, where it was held that shares of stock issued by a bank (created by merger) in exchange for the shares of the component banks in the merger did not constitute a distribution of earnings which called for an apportionment between a life tenant and remainderman."

*sale nor a liquidation of corporate property, . . .* [and]
*is not tantamount to a distribution or division of as-
sets which calls for an apportionment between a life
tenant and remainderman.'* "*

Appellees seek to distinguish the present cases from
*Jones Estate* because a merger was there involved and
no merger is here involved. However, they overlook
the indisputable fact that in *Jones Estate* (1) there
was (as here) a *capitalization of earnings* which had
accumulated since acquisition of the stock by the trus-
tees, and (2) an accompanying distribution to the trus-
tees of *additional* shares of new stock, and (3) that
counsel contended there, just as counsel here contend,
that a capitalization of earnings and an accompanying
distribution of *additional* stock (which also had a dif-
ferent par value) created an apportionable event. This
Court, we repeat, unanimously rejected that contention
and found no reason or authority or justification for
extending the rule to hold that an apportionable event
occurs *whenever* there is a capitalization of earned sur-
plus and the issuance of additional stock based thereon.

The basic fallacy of this contention of the life ten-
ants is that net earnings are placed in earned surplus
for future distribution to, and in effect *constitute* a
trust fund for, stockholders. If that were so, then we
should overrule *Jones Estate,* 377 Pa., supra. Net
earnings are placed in earned surplus (or in profit and
loss) for a variety of reasons—to cover, inter alia, the
vicissitudes and the future needs of the business, busi-
ness improvements, business expansion, business losses,
automation, a reserve for contingencies, a cash reserve
for working capital, and a reserve for other corporate
purposes which may arise in the future, as well as for
possible future payment of dividends.

---

* Italics throughout, we repeat, ours.

To summarize:

For each and all the reasons hereinabove mentioned, I agree with the rest of the Court that the "change and conversion" or stock split by General Electric Company was *not* an apportionable event.

### Gulf Oil Corporation

The testamentary trustee purchased a total of 125 shares of the common stock of Gulf Oil Corporation for an average *cost* of $69.89 per share or a total cost of $8736.50. Each of these shares had a *par value of $25;* each had a *book value* of $71.98 a share as of the dates of purchase, or an aggregate book value (as of the purchase dates) of $8997.95. Gulf Oil paid a small cash dividend quarterly, and a small annual stock dividend of 4% or 5%, all of which, as will hereinafter more fully appear, belong to the life tenants.

The board of directors of Gulf Oil Corporation authorized "the distribution to its shareholders of record on June 15, 1951, of one additional share of capital [common] stock [with a *par value of $25*] for each share of its capital stock held by such shareholder." As a result of this 100% *extraordinary stock dividend,* the trust estate's holdings of 125 shares were increased to 250 shares. In order to validly declare and distribute this extraordinary stock dividend, the company was compelled to add to its capital account $25 per share for each additional ($25 par value) share issued. It effectuated this increase in capital by transferring from *earned surplus* to the capital stock account $18.549 per share* and $6.45 per share from *paid-in surplus.* The *book value after* the record date of the extraordinary stock dividend was $41.77 a share; the *market value* of each share was $47.09.

---

* $11.55 of this amount represented "applicable" earnings.

If capital had been increased by transferring $25 per share from *"earned surplus"* to capital, this would have been clearly and unquestionably a pure extraordinary stock dividend. If a 100%, or 75%, or a 50% stock dividend had been declared and paid *from earned surplus* by Gulf Oil Corporation there wouldn't be the slightest doubt that this extraordinary stock dividend would be an apportionable event, and presumptively all of it would belong to the life tenant. If the Company had declared and paid out of *earned surplus* a 75% stock dividend, and had also simultaneously declared and paid out of *contributed surplus* a 25% stock dividend, it is clear as crystal (1) that the 75% extraordinary stock dividend paid out of *earned* surplus would be an apportionable event and presumptively all of it would be payable to the life tenant, and (2) the 25% extraordinary stock dividend which was paid out of *contributed* surplus would belong to corpus. The fact that the two have been combined in this case, cannot alter their basic character, nor the legal effect which flows therefrom. In other words, the fact that only $18.54 instead of $25 per share was transferred from *earned surplus* cannot completely or legally change the character of the transaction, or deprive the life tenant of his share of the net earnings which are distributed in this stock dividend. That the majority's position is clearly unfair, unwise and unjust is made strikingly manifest by the fact that if the Gulf Oil Company's extraordinary stock dividend was payable 99% out of earned surplus and 1% out of contributed surplus, the majority would hold that this was a non-apportionable event and no part of the dividend would be payable to the life tenant.

Unlike General Electric, this was not a "change and conversion"; there was no change in the par value of the stock, and there was no accompanying stock split. As

further evidencing the material difference between the two transactions—in General Electric the change, conversion and split had to be effectuated by the action of the stockholders and by an amendment of the charter; in Gulf Oil, the dividend was paid solely as a result of a resolution adopted by the board of directors.*

To hold that this extraordinary stock dividend was not an apportionable event, would violate the primary, paramount purpose and object, as well as the letter and spirit of the Rule, and would deprive the life tenant, who is the primary object of testator's bounty, of the applicable net earnings to which, on principle, reason and authority, he is entitled. We emphasize that these accumulated applicable net earnings have not been retained by the corporation but, on the contrary, have been paid out to the testamentary trustee *in the form of a stock dividend which has always heretofore been apportionable.*

If there could be the slightest doubt that this was an apportionable event, it would be removed by *Chauncey's Estate,* 303 Pa. 441, 154 A. 814, which specifically holds (a) that such a stock dividend is an apportionable event, and (b) that corpus is entitled to receive those shares which are necessary to preserve intact value plus the portion of the shares which were paid out of contributed surplus. In that case the Court said (pages 445, 447) : "Distribution of extraordinary dividends between a life tenant and remainderman shall be made so as to preserve the intact value of the estate: Flaccus's Est., 283 Pa. 185; Nirdlinger's Est., 290 Pa. 457. Such dividends presumptively belong to the life tenant, unless it appears that the intact value of the trust estate is thereby reduced *or that the life ten-*

---

* The company had to increase the number of shares authorized, although if the charter had provided for a sufficient number of shares, that would have been unnecessary.

*ant is not otherwise entitled*: Nirdlinger's Est., supra, page 468; Graham's Est., 296 Pa. 436; McKeown's Est., 263 Pa. 78. The burden is on the remainderman to prove that the intact value of the trust estate is thereby diminished or that he is entitled to the dividend or a part of it: Graham's Est., supra; Boyer's App., 224 Pa. 144; Robinson's Trust, 218 Pa. 481.

". . . We there [Dickinson's Est., 285 Pa. 449] held that paid-in capital did not constitute earnings . . . . We there held that *in apportioning a stock dividend which was declared from a surplus which in part represented contributed surplus and in part earned income, enough shares should be awarded to the corpus of the estate to maintain the intact value plus that portion of the shares issued against contributed surplus.** From this case we have the rule that stock dividends declared out of contributed capital must, in the distribution between life tenant and remainderman, be held in the corpus of the trust for the protection of the remainderman."

We are convinced that on principle, reason and authority this was clearly and unquestionably an extraordinary stock dividend and (as the orphans' court correctly held) was apportionable between principal and income. We note, parenthetically, that the orphans' court also correctly held that the life tenants in such a situation are entitled to receive *only so much* of the stock dividend as represents the earnings of the corporation which (1) were earned subsequent to the acquisition of the stock by the trustee, and (2) have been capitalized to support the issue of the extraordinary stock dividend, and (3) are not necessary to preserve intact** value.

---

* We repeat, italics throughout, ours.

** What is intact value will be hereinafter discussed at length.

## Yardsticks or Measuring Rods

What are the correct applicable yardsticks or measuring rods to enable a court to determine the net earnings which appear in dividend form, or in stock rights, or in gains on the sale or liquidation of stock, and to which the life tenant is equitably entitled?

In the leading case of *Waterhouse's Estate,* 308 Pa. 422, 162 A. 295, the Court for the third time in thirteen years and the second time in five years felt compelled, because of the "confusion with respect to our rules governing the questions involved [the apportionment between the life tenant and the remainderman in a trust estate of the proceeds received from the sale of stock, and stock rights] to briefly summarize what has been heretofore decided." The Court said (pages 427-430), and *I would reaffirm** with several clarifying additions:

". . . prima facie, *intact value is book value.*[2] Intact value may be increased by stock purchases, contributed surplus or any other capital increase not attributable to earnings,[3] and it is subject to capital losses.[4] . . .

"The income from the estate, unless otherwise determined by will, is distributed as follows:

---

* Orphans' courts and trustees throughout the Commonwealth have urged us to erect or relight guideposts to cover the situations which frequently arise in apportionment cases, and I believe that, so far as is practicable, we should comply with their requests.

"[2] Baird's Est., 299 Pa. 39, 42." To this we add: *Arrott Estate,* 383 Pa. 228, 232 (as to decedent-owned stock) ; *Fisher's Estate,* 344 Pa. 607, 614; *King Estate (No. 2),* 355 Pa. 64, 68.

"[3] Dickinson's Est., 285 Pa. 449, 453; Packer's Est. [No. 1], 291 Pa. 194, 197; Jones v. Integrity Trust Co., 292 Pa. 149." To these we add: *Arrott Estate,* 383 Pa. 228, 232.

"[4] Dickinson's Est., supra; Packer's Est., supra." To these we add: *Lueders' Estate,* 337 Pa. 155, 159; *Arrott Estate,* 383 Pa. 228, 232.

"[a] *Ordinary* cash or scrip [or stock] dividends coming to it belong to life tenants regardless of how soon after testator's death they are declared by the company whose stock is held in the corpus. . . ."

In order to avoid costly, vexatious, "de minimis" litigation, and to eliminate conflict and confusion, and to comply with the requests of Bench and Bar to make clear and definite the rules with respect to various situations that frequently arise, I would add: An *ordinary* cash dividend and an ordinary stock dividend belong to the life tenant, irrespective of when earned and irrespective of whether the intact value is or is not thereby impaired. Ordinary cash dividends include *small extra* cash dividends which are paid currently or irregularly (usually at year's end).* *Ordinary stock dividends* would include stock dividends which are paid quarterly, semi-annually or annually, currently or irregularly, and do not exceed 6% in any one year.

"[b] Extraordinary dividends, . . . are distributed and apportioned as follows. The presumption is that an extraordinary stock [or cash] dividend is from earnings and belongs to the life tenant.[7] . . . .

"In the distribution of a[n extraordinary] stock dividend the 'intact value' must be preserved. When it appears that the distribution of a[n extraordinary] stock dividend to the life tenant [which is paid out of applicable earnings] will impair the intact value of the trust estate by reducing it, then there must be an

---

* For examples see the extra dividend of $1 paid by General Motors at the end of 1957, the 50¢ extra dividend paid by Norfolk & Western Railroad Company, the 40¢ extra dividend paid by Union Pacific R. R. Co., the 20¢ extra dividend paid by Atchison, Topeka & Santa Fe, and the 40¢ extra dividend paid by Standard Oil Company of New Jersey.

[7] Earp's App., supra; Graham's Est., 296 Pa. 436; Chauncey's Est., 303 Pa. 441, 446; McKeown's Est., supra." To these we add: *Hostetter's Trust*, 319 Pa. 572, 574.

apportionment between the life tenant and the remainderman,[9] so as to preserve the intact value of the corpus of the estate,[10] plus any increase in that value through share purchases, or from contributed surplus or any proper capital increase,[11] [including any enhancement which is not due to applicable earnings*], and less any decrease for capital losses.[12]

"Where an extraordinary stock dividend is made from increased capital assets *not chargeable to earnings,* such as contributed surplus and the like, the stock dividend belongs to the corpus.[13] . . .

"[c] Where stock that produces income owned by the estate is sold for a price greater than the intact value (as defined and considered above) and such greater price is due to an accumulation of income, the proceeds are apportionable; that is, so much of the proceeds as necessary to preserve the [adjusted] intact value (as above defined) goes to the trustees for the corpus, and *only so much of the balance that represents income* goes to the life tenant.[15]

"But where the greater value is due to the stock's earning power, good will, or its intrinsic, speculative, *or enhanced market value, all the proceeds are part of the corpus* and belong to the remainderman; the increase is capital gain.[16]

---

"[9] Earp's App., supra; Chauncey's Est., supra; McKeown's Est., supra; Graham's Est., supra; Waterman's Est., 279 Pa. 491."

"[10] Flaccus's Est., 283 Pa. 185; Nirdlinger's Est., supra."

"[11] Dickinson's Est., supra; Chauncey's Est., supra."

* *Nirdlinger's Estate,* 290 Pa., supra; *Packer's Estate (No. 1),* 291 Pa., supra.

"[12] Dickinson's Est., supra." To points 11 and 12 we add: *Flinn's Estate,* 320 Pa. 15, 18; *Lueders' Estate,* 337 Pa. 155, 159.

"[13] Chauncey's Est., supra."

"[15] McKeown's Est., supra; Nirdlinger's Est., supra."

"[16] See Nirdlinger's Est., supra, and authorities cited at page 479."

"The presumption is that the proceeds from the sale of stock belong to the corpus of the trust and the burden of proving that they do not rests on the person asserting a claim to them.[17]

"[d] Proceeds arising from the sale of stock rights should be distributed in the same manner and have the same presumptions following as in the sale of stock. . . .

". . . In all cases, in determining the share which the life tenant is to receive based on apportionment, *his share is limited to such an amount as is attributable to income or can be fairly included therein.*[20] *It does not include increases of capital assets not due to earnings,* and in the sale of stock rights earnings do not include such items as speculative value, enhanced market value, or the stock's earning power.

"When the trustees sell stock rights, the presumption is that the proceeds derived therefrom represent capital assets of the estate, and the burden of showing the contrary rests on those who assert a claim to the fund or part of it."

The life tenants nevertheless contend—notwithstanding the indisputable fact that *Waterhouse's Estate,* 308 Pa. 422, supra, and numerous prior and subsequent decisions of this Court (as recently as *Arrott Estate,*\* 383 Pa. 228, supra), agree (1) that a life tenant is entitled *only to such distributed net earnings which accumulated during his life tenancy,* as do not impair the adjusted intact value of the stock and (2) that the adjusted intact value and all other enhancement in the value of the stock belongs to corpus—"that the remaindermen are entitled to just what the stock was actually worth at the time of the creation of the

---

"[17] McKeown's Est., supra; Nirdlinger's Est., supra."

"[20] Chauncey's Est., supra."

\* *Arrott Estate* will be hereinafter fully discussed in connection with another point.

trust, no less and no more." In support thereof they cite *Boyer's Appeal*, 224 Pa. 144, 73 A. 320; *Barnes Estate*, 338 Pa. 555, 560, 12 A. 2d 912; *Lueders' Estate*, 337 Pa. 155, 158, 10 A. 2d 415.

While the aforesaid terse statement was accurate in those cases, it is not a correct statement of the general rule. It was accurate in those cases because they involved an extraordinary stock dividend which was paid out of applicable earnings, and there was no impairment of "intact" value, and no capital increase since the trust's acquisition of the stock. It was not an accurate statement of the general rule, *because basically the life tenant is only entitled to applicable earnings which are being distributed in dividend form or in gains from sales or liquidation, or in the form of stock rights, and the remainderman is entitled to everything else.* The life tenants, and sometimes the Courts, have forgotten that the *basic reason for,* and the *primary and paramount purpose of,* the theory, doctrine or rule for equitably apportioning stock and other kinds of dividends, stock rights and gains from the sale or liquidation of stock, is to give to the life tenant *so much thereof* as represents net earnings which had accumulated during the life tenancy. "Intact value" was never the basic reason for, nor the primary or paramount goal of, apportionment—it was only a measuring rod* to enable the Court to ascertain the earnings to which the life tenant was equitably entitled. The contention of the life tenants is fallacious for the additional reason that it overlooks the indisputable fact that *original* "intact value"—under all the cases commencing with *Dickinson's Estate*, 285 Pa., *Packer's Estate*, 291 Pa., *Nirdlinger's Estate*, 290 Pa., *Waterhouse's Estate*, 308

---

* Even this measuring rod has as many colors and gradations as a rainbow.

Pa., *Flinn's Estate*, 320 Pa., *Chauncey's Estate*, 303 Pa., and even *Lueders' Estate*, 337 Pa. and *Arrott Estate*, 383 Pa., upon which the court below mainly relies—must be adjusted (i.e., increased or decreased) for capital contributions, capital increases (including capital gains and other enhancement of market value) and capital losses.

*Lueders' Estate*, 337 Pa., which is one of the two cases mainly relied upon by life tenants, is an apt illustration of the fallaciousness of their argument that "the remaindermen are entitled to just what the stock was actually worth at the time of the creation of the trust, no less and no more", or that only original intact value is to be preserved, and everything else belongs to the life tenant. In *Lueders' Estate* the question involved the apportionment of an extraordinary dividend which took the form of a $45 (per share) promissory note which was payable at the option of the company in its preferred stock. There had been *operating* losses which considerably reduced the *original* intact value, and which in certain years impaired the amount of undistributed earnings which existed at the time of the testator's death. The Court said: "The answer to this attempt [to adopt an *original* intact value which will constantly fluctuate and be reduced by *operating* as distinguished from *capital* losses] is to be found in an overwhelming array of cases establishing the rule to be that, where extraordinary dividends are declared and paid on shares of stock left by a decedent in trust, they must be distributed by adding to the corpus a sufficient portion to keep intact the value of the shares *as they existed at the time the trust was created,* and allotting the balance to those entitled to the income of the trust estate: [citing numerous cases]. In the case of Boyer's Appeal [224 Pa. 144] it was said (p. 151): 'It seems to be the doctrine of

our cases, that the remaindermen are entitled to just what the stock was actually worth at the time of the creation of the trust, no less and no more.' "

That the foregoing statements were not an accurate statement of the general rule is strikingly demonstrated by the rest of the opinion (which the life tenants omit) which recognizes that ". . . the intact value existing at the time of the creation of the trust may be added to by 'capital increases' or diminished by 'capital losses' sustained by the corporation: Packer's Estate (No. 1), 291 Pa. 194, 197; Nirdlinger's Estate, 290 Pa. 457, 464; Waterhouse's Estate, 308 Pa. 422, 427, 428."

It is clear as crystal that the foregoing excerpts or succinct statements relied upon by the life tenants are *not* an accurate statement of the *general rule* pertaining to "intact value".

With the exception of *Arrott Estate,* 383 Pa., supra, and cases involving stock rights, which will be hereinafter discussed, we believe that nearly all the cases can be reconciled by limiting the loose or general expressions contained therein to the facts of that particular case. In other words, excerpts from the language of an opinion, such as the quotations from *Boyer's Appeal,* 224 Pa. 144, *Lueders' Estate,* 337 Pa. 155, and *Barnes Estate,* 338 Pa. 555, must be considered in connection with the facts of that particular case, and when so considered are not irreconcilable with the *general rule* pertaining to "intact value".

## "Intact Value"

"Intact Value" is a very essential ingredient of the Rule of Apportionment, but there is considerable confusion as to (1) what is "intact value" and since *Arrott Estate,* 383 Pa., (2) what is (a) original intact value, (b) what is apportionment date intact value, and (c) what is intact value for purposes of allocating shares in distribution.

What is the fairest and best yardstick or measuring rod or rods to enable the court (where an extraordinary dividend is paid, or stock is sold, or stock rights are sold or exercised) (1) to preserve for corpus its original intact value plus all capital contributions and capital increases (less capital losses) *together with all other enhancement of value,* and (2) to give to the life tenant so much of the dividend (or proceeds of sale) as represents (hitherto undistributed) net earnings which have accumulated during his life tenancy and do not impair the adjusted intact value. The courts have found it difficult to devise and formulate a *fixed uniform* yardstick or measuring rod which will produce equity, and at the same time be practical and readily applicable to *all* situations. The *general* rule which took some time to evolve and has sometimes been variously and loosely or inaccurately expressed, *is based* upon a judicially devised yardstick known as "intact value".

For a considerable period of time the courts floundered upon a definition of "intact value". Market value was used as intact value in *Earp's Appeal,* 28 Pa. 368; book value was not mentioned. Thereafter the courts sometimes used one, sometimes indiscriminately all, of the following yardsticks for "intact value", viz., intrinsic value, actual value, liquidating value and book value—as if they were synonymous, although actual value, book value and liquidating value are often very different.\* Then gradually *book* value became recognized (at least prima facie) as "intact value"; and

---

\* Few, if any, can agree as to what "intrinsic" value really is; actual value generally means market value; book value usually differs from liquidating value because the former does not make provision for capital gains, taxes, broker's commissions, and losses which almost always and inevitably occur if and when an industrial, manufacturing, railroad or similar corporation is liquidated.

*market value was entirely discarded*: *Moss's Appeal,* 83 Pa. 264; *Smith's Estate,* 140 Pa. 344; *Stokes' Estate (No. 1),* 240 Pa. 277; *Stokes' Estate (No. 2),* 240 Pa. 288;* *McKeown's Estate,* 263 Pa. 78; *Dickinson's Estate,* 285 Pa. 449; *Nirdlinger's Estate,* 290 Pa. 457; *Jones v. Integrity Trust Company,* 292 Pa. 149; *Packer's Estate,* 291 Pa. 194; *Baird's Estate,* 299 Pa. 39; *Flaccus's Estate,* 283 Pa. 185; *Chauncey's Estate,* 303 Pa. 441; *Waterhouse's Estate,* 308 Pa. 422; *King Estate (No. 1),* 349 Pa. 27; *King Estate (No. 2),* 355 Pa. 64; *King Estate (No. 3),* 361 Pa. 629; *Steele Estate,* 377 Pa. 250; *Arrott Estate,* 383 Pa. 228 (as to decedent-owned stock).

This evolution to "book value" probably started with *Moss's Appeal,* 83 Pa. 264, in 1877.

In *Moss's Appeal,* 83 Pa., supra, The Pennsylvania Company, having a surplus of earnings, amended its charter in order to increase its capital by the issue of new stock. The company gave each stockholder a right or option to subscribe at par, share for share. The testamentary trustee owning 100 shares of stock, sold 60 rights and with the proceeds purchased 40 shares of stock at par. The life tenant claimed that this was, in effect, an actual distribution of earned surplus or profits and that she was entitled to 33 shares of the stock based upon market value. The Court held that *market value was not the applicable yardstick* and that the corpus was entitled to all of the 40 shares and the life tenant to none. The Court said (pages 270-271):

---

* The Court in *Stokes' Estates* and *Boyer's Estate,* after deciding that book value was intact value, said: "The market value may aid in the ascertainment of the actual value and is therefore properly received in evidence on that issue". This is a confusing, if not an erroneous statement, and fortunately has never been applied, so far as our research shows, in any case since 1857.

"The fallacy of this theory [of the life tenant] consists in the fact of estimating the one hundred and forty shares, not at their actual value at the time of the transaction, but at their market value, . . . . A more uncertain rule could not well be imagined. It would make the rights of the parties depend upon the condition of the stock market, which is as variable as the tides, without their regularity. Market values are well enough upon a question of distribution, where the parties are about to realize; but upon a question of values between life-tenants and remaindermen, a judicial decree should go down through the shifting sands of the stock market until it reaches the solid rock of actual values. The application of any other rule might work serious injustice. It is well known that within the last year the stock of more than one large corporation has varied in price over one hundred per cent."

In *Smith's Estate*, 140 Pa. 344, 21 A. 438, a railway company increased its capital stock and provided that each stockholder should have the privilege of buying at par one share of the new issue for every three shares of the stockholder's original holding. The testamentary trustee exercised the option and purchased the stock. Two weeks thereafter the company declared *a dividend of $11* per share upon its entire capital stock, including the new issue. The effect of the dividend was to give to the purchasing stockholders what they paid for the new stock. The market value was practically the same before the stock was issued and after it was issued.

Judge PENROSE* held that both the extraordinary dividend, and the proceeds of the sale by the testamentary trustee of the 18 shares of new stock belonged to

---

* Judge PENROSE is generally considered to have been the ablest judge in orphans' court matters, in the history of Pennsylvania.

principal since "the dividend was in no sense a dividend of profits earned, . . . in the lifetime of the tenant for life; . . . . The extra dividend was nothing else than a return to the stockholders of the money paid *in carrying out the scheme* for increasing the number of shares of stock, and we must decide upon facts without regard to the names which may have been applied in distributing the fund. . . . It is of no importance, if it be the fact, that the market price of the stock was not affected by the new issue. As between tenant for life and remainderman, as was said in Moss's App., 83 Pa. 271, the question of value is to be determined, *not by the fluctuations of the stock market,* but by the actual assets held by the corporation making the stock dividend."

This Court affirmed the decree of the orphans' court and said (page 357) : ". . . the question of value is to be determined, not by the fluctuations of the stock market, but by the actual assets held by the corporation: Moss's Appeal, supra; Biddle's Appeal, supra."

Whatever doubt may have existed as to whether market value was or was not "intact value", was definitely and finally resolved in favor of *book* value in *Dickinson's Estate,* 285 Pa. 449, 132 A. 352. That case involved the distribution of a 100% stock dividend. Testator, at the time of his death, was the owner of 120 shares of stock of The Fire Association of Philadelphia. It had a par value of $50 a share, a liquidating or *intrinsic value of $142.61 a share,* and a market value of $415 a share. The trustees were awarded 120 shares at their *liquidating* value of $142.61 a share. There was an extraordinary fire loss which reduced the liquidating value of the stock from $142.61 a share, to $71.09 a share. The Court held that this figure of $71.09 a share was the "intact value" which was to be used in computing the apportionment of the extraordi-

nary stock dividend *even though the market value was much higher.*\* The Court said (page 455) : "Such distributions must be made according to equitable principles, however, and *neither par* value *nor market value* play any part in them, but only intrinsic value : Smith's Est., 140 Pa. 344."

In *Jones v. Integrity Trust Company,* 292 Pa. 149, 140 A. 862, *a testamentary trustee purchased* 401 shares of stock of the United Gas Improvement Company which had an *intact-book* value of $81.14 per share. The case involved the apportionment of (1) rights to subscribe to the stock, and (2) an extraordinary stock dividend. The Court based its apportionment on *book* value and said (pages 155, 156) : "*Market value has nothing to do with such distributions;* under all the situations which arise only the intact value is to be considered. This is made very clear in Dickinson's Estate, supra, where the court below made the same mistake; and we repeated our conclusion on this point in Nirdlinger's Estate, supra, and in Packer's Estate (No. 1), 291 Pa." It is especially noteworthy that *book value* was applied and market value was rejected as "intact value" *in trustee-purchased stock.*

In *Baird's Estate,* 299 Pa. 39, 148 A. 907, the Court again reiterated that "intact value" was prima facie *book* value at the date of testator's death and that *market value was of no moment.* The Court said (pages 41-42) : "The rule for determining the intact value of

---

\* The association, in order to increase its financial standing, on two occasions issued new stock at a price above par and carried the excess to what it termed a "contributed surplus account." The Court said that "As this was not income which had accrued on the stock, but rather represented a part of the excess of market value over par value, it necessarily belonged . . . to the corpus of the trust (Graham's Est., 198 Pa. 216), and the intact value of each share was increased accordingly."

an estate, the income from which is to be paid to a life tenant with the remainder of the corpus over to designated persons, has not been definitely set forth. We know that it is fixed as of the date of testator's death and, as indicated in Nirdlinger's Estate, 290 Pa. 457, 'intact value includes the par value of the stock, plus any accumulation of income, earned before the death of the testator . . . : Earp's App.' Whether it is entitled to any further increases has not been definitely ruled. *Market value has been eliminated as a standard of measurement*: Packer's Est. (No. 1), 291 Pa. 194, 197; Jones v. Integrity Trust Co., 292 Pa. 149, 155. We have stated indiscriminately in our decisions that intact value is actual, intrinsic, liquidating or book value,* *but the customary standard of measurement used in the cases is book value. The prima facie standard of measurement of intact value* of trust estates, the income of which is to be paid to a beneficiary, with remainder over, *is the book value*; . . . ."

*Baird's Estate* was followed by the leading case of *Waterhouse's Estate,* 308 Pa. 422, 162 A. 295, where, we repeat, this Court felt it necessary to once again restate "prima facie, *intact value is book value."*

In *King Estate (No. 2),* 355 Pa. 64, 48 A. 2d 858, the Court again reviewed the occasions which created an apportionable event and then said (page 68) : ". . . 'There is probably no more difficult and intricate branch of the law than the application of what is termed the Pennsylvania, or American, Rule of Apportionment. The principle of equitable apportionment was early established (see Earp's Appeal, 28 Pa. 368), and its development and refinements are ably discussed by former Chief Justice KEPHART in Nirdlinger's Es-

---

* In spite of this definition, these values, we repeat, are often very different.

tate, 290 Pa. 457, 139 A. 200, and in Waterhouse's Estate, 308 Pa. 422, 162 A. 295. . . .' *Prima facie, intact value is the corporate book value,* and this standard remains fixed unless it can be established that the elements making up the book value are not true values.[*] Ordinarily the courts will accept the company's manner and method of charging items as correct when it is done in good faith."

Mr. Justice, now Chief Justice, JONES, in a dissenting opinion, recognized that book value and not market value, was intact value and said (page 78) : "The sale price of the preferred (i.e., its market value at the time sold) would have no materiality in establishing its intact value after the exchange distribution. *Market value is not evidence of intact value*: see Baird's Estate, supra, at p. 42."

In *King Estate (No. 3),* 361 Pa. 629, 66 A. 2d 68, this Court again reiterated that "intact value" is *book* value and that market value and intact value are *un*related. This case involved a merger. While there was a difference of opinion among the members of the Court as to a number of the issues there involved, there seemed to have been no difference of opinion on the following statement in the majority opinion : "The necessity of preserving intact value does not mean a preservation in the sense of the estate's actually obtaining the amount of that intact value in cash, but only a *preservation of its book value; intact value and market value are, for this purpose, wholly unrelated;* many stocks sell on the market for less than one-tenth of

---

[*] In order to avoid confusion and a multiplicity of litigation, I would add that "This standard of 'book value' remains fixed in the absence of fraud or bad faith, or a material change in bookkeeping between the date of original intact value and the date of the apportionable event."

their book values, while other stocks, especially if speculative in nature, sell for many times their book values; the value of a stock in the market depends upon a myriad of factors other than the actual inventory value of the company's assets as reflected in the books of the corporation."

In *Steele Estate,* 377 Pa. 250, 103 A. 2d 409 (1954), which involved an extraordinary stock dividend, the Court said (page 254) : "Appellants contend that the market value of the estate's holding of stock in the Easton Publishing Company would be very greatly reduced if the stock dividend were distributed to the life tenant instead of being added to and retained by the corpus of the trust. The complete answer is that even if true this is immaterial; under the testamentary direction to pay the net income to his daughter, and under the then existing law of Pennsylvania, *market value is of no materiality;* and the fact, if it be a fact, that the market value of the stock held in trust would be greatly reduced is not sufficient to defeat Mrs. Fretz's legal right to this stock dividend : King Estate, 361 Pa. 629, 635, 66 A. 2d 68; Waterhouse's Estate, 308 Pa. 422, 428, 162 A. 295; Jones v. Integrity Trust Co., 292 Pa. 149, 152, 155, 140 A. 862; Packer's Estate (No. 1), 291 Pa. 194, 197, 139 A. 867."

It is indisputably clear from a review of a host of cases, including those hereinabove cited and quoted, that "intact value" always meant in every situation from 1876 until 1955—*book* value, *not market* value.

### Why Market Value Was Rejected as the Yardstick for "Intact Value"

Except possibly in family or closely held corporations, market value (of stocks listed on an Exchange) is, in nearly all cases and for nearly all purposes, the truest measure or determinant of actual value. However, where a yardstick or measuring rod or rule is de-

vised to give to a life tenant an *equitable* share of an extraordinary stock dividend, or of a gain on the sale of stock, or of stock rights, which (wholly or in part) represent accumulated applicable net earnings, it is clear as crystal that a weather-vaneish market value is neither a stable nor an accurate or a fair or realistic or equitable measuring rod of *applicable net earnings.*

Market value (of stocks) with its daily, and periodically wide, fluctuations reflects and therefore is based upon a great many variables besides earnings—such as, inter alia, (a) the present condition, and the future growth prospects of this particular corporation and of the Industry of which it is a part, (b) earning power, (c) dividend payments (present, past and likely-future), (d) the economic condition of our Country, (e) the anticipated near-future prosperity or depression of our Country, (f) the money market, (g) marginal requirements, and speculation, (h) prospects of an advantageous merger, (i) an actual long, or threatened protracted strike, (j) war or threats of war, and (k) politics.

### Arrott Estate

For the first time in nearly eighty years, four members of this Court suddenly decided in 1955, that purchase price (market value)* instead of book value, constituted "intact value", although they limited it to one particular situation. In *Arrott Estate,* 383 Pa. 228, 118 A. 2d 187, a four-man Court unexpectedly decided that

---

* The Court stated that it was inaccurate to say that cost or purchase price and market value of listed stocks are synonymous. We repeat: Every stock broker, every banker and nearly every frequent purchaser of stocks knows that the *cost* of stocks listed on the New York Stock Exchange and other stock exchanges is almost always the same, at the dates they were purchased, as (the then prevailing) "market value".

in determining the apportionment of an extraordinary stock dividend, the original "intact value" of any stock which was *purchased by the trustee* was not its book value at the date of purchase, but its purchase price.* The purchase price, which the parties and the Court agreed was its market value, exceeded the book value. The Court once again recognized that *book* value was (prima facie) "intact value" for decedent-owned stocks. The Court, after approving *Nirdlinger's Estate,* 290 Pa. 457, 463, *Packer's Estate (No. 1),* 291 Pa. 194, and *Waterhouse's Estate,* 308 Pa. 422, 427, and after quoting with approval from the Court's opinion in *Nirdlinger* and *Waterhouse,* said (pages 232-235):

"In Baird's Estate, 299 Pa. 39, 42, 148 A. 907, this Court said: '. . . We have stated indiscriminately in our decisions that intact value is actual, intrinsic, liquidating or book value, but the customary standard of measurement used in the cases is *book* value. The prima facie standard of measurement of intact value of trust estates, the income of which is to be paid to a beneficiary, with remainder over, is the book value;* . . .'

"It appears frequently from the reported cases that when the prevailing market value was in excess of the book value, the remaindermen contended that market value should be preserved rather than book value—which, obviously, would be to their advantage. *This Court has decided consistently that it is the 'book' value* (as above determined) *and not the 'market' value which should be preserved.*"

The Court then said: "It is quite different, however when trustees purchase stock with cash from the corpus

---

* In order to avoid confusion and a multiplicity of litigation, I would add that "This standard of 'book value' remains fixed in the absence of fraud or bad faith, or a material change in fixing the value of assets between the date of original intact value and the date of the apportionable event."

of the trust. . . . When, however, the trustee purchases stock, it is the purchase price, and not the book value, which constitutes its intact value." The Court was referring to the stock's *original* intact value; it did not decide (a) how its intact value was to be determined *after* the extraordinary stock dividend, or (b) how the shares were to be valued for purposes of distribution. The failure to decide these last two *absolutely essential* parts of the Rule of Apportionment is one of the main reasons for the various and varying (over a dozen) yardsticks which have been applied or advocated by judges, or trustees or attorneys in the *Cunningham, Harvey* and *Trimble* Trust Estates.

The *Arrott* case, in order to support its new and novel position that *original intact value* was not book value when the stock was purchased by the trustee, relied upon *Bullitt's Estate,* 308 Pa. 413; *Jones v. Integrity Trust Company,* 292 Pa. 149; *Hostetter's Trust,* 319 Pa. 572,—none of which support it—and then said: "We need not cite our numerous cases on this subject . . . and attempt to analyze their facts and seek to reconcile them."

We shall analyze the cases upon which *Arrott* relied to change and substitute *market* value (purchase price) for the 80 year old rule of *book*-intact value.

Although the Court in the first part of its opinion in *Arrott Estate* relied (inter alia) upon *Jones v. Integrity Trust Company,* 292 Pa. 149, it thereafter said —concerning *Jones v. Integrity Trust Company* which had declared that *intact value meant book value for trustee-purchased stock*—(page 235):

"Appellants rely largely on the following statement in Jones v. Integrity Trust Co., 292 Pa. 149, 155, 140 A. 862: '. . . *market value* [which was much higher] *has nothing to do with such distributions; under all the situations which arise only the intact value is to be*

*considered.** . . .'* Apparently in that case there existed a complicated corporate situation involving shares of stock originally held by testator, new shares purchased by the trustee, and extraordinary stock dividends. The appeal, however, was quashed on the ground that the case stated did not present sufficient facts on which to base a judgment. Under such circumstances the . . . [Court's opinion] cannot be seriously regarded as an authority in support of appellants' contention [that market value has nothing to do with such distributions]." This seems to be an extraordinary statement after the *Arrott* opinion writer had just recognized *Jones v. Integrity Trust Company* as an authority (page 233) : " '. . . In Bullitt's Estate, 308 Pa. 413 at 420, Mr. Justice KEPHART said : "Following Jones v. Integrity Trust, 292 Pa. 149, in the purchase of stock under stock rights, the reasoning being parallel, there should have been added to the intact value of 1902, the *book* value of the 383 shares donated or awarded to the principal; this forms a new intact value as a basis for future distribution; . . . . See Waterhouse's Est., 308 Pa. 422." ' "

*Jones v. Integrity Trust Company,* 292 Pa. 149, supra, is factually exactly in point and holds exactly to the contrary of the *Arrott* opinion. In that case, the *trustees purchased* a number of shares of United Gas Improvement Company stock, and the (principal) question involved** was how the extraordinary stock divi-

---

* The clause which is underlined was also stated to be the law of Pennsylvania in a host of cases hereinabove cited or quoted.

** With respect to the shares which were purchased by the exercise of rights to subscribe, to which the life tenants were entitled, the Court said (page 154) : ". . . If, . . . the new shares were paid for, in whole or in part, out of money in the hands of the trustees, they would be entitled to a credit therefor on the income side of their account."

dend of 25% should be apportioned between corpus and income. The Court found that the *intact value* of the shares *purchased by the trustees* had a *book or intact value* of $81.14 per share at the time of their purchase and this book value had to be preserved for the remainderman. With respect to the apportionment of the dividend Justice SIMPSON said (pages 155-156) : ". . . [The hearing Judge] concluded that all of the 100 shares received on the twenty-five per cent extraordinary stock dividend, would have to be awarded to the corpus of the trust, but for the fact that by the case stated the market value of the shares, at the time suit was brought, was said to be $106 each. He therefore apportioned the 100 shares on the basis of this figure, giving to the corpus a sufficient number, *measured by that price*, to make up the difference between the intact value at the time of the purchase of the 401 shares, and their intact value *after* this stock dividend was declared and distributed. This, also, was error. *Market value* [which was much higher] *has nothing to do with such distributions; under all the situations which arise only the intact value is to be considered*. This is made very clear in Dickinson's Est., supra, where the Court below made the same mistake; and we repeated our conclusion on this point in Nirdlinger's Est., supra, and in Packer's Estate (No. 1), 291 Pa. 194."

The *Arrott* opinion in thus summarily dismissing *Jones v. Integrity Trust Company* as a worthwhile authority against market value, apparently overlooked the fact that in *Baird's Estate,* 299 Pa. 39, from which the *Arrott* opinion quoted with approval, the Court said (page 42) : "Market value has been eliminated as a standard of measurement: Packer's Estate (No. 1), 291 Pa. 194, 197; Jones v. Integrity Trust Company, 292 Pa. 149, 155." The *Arrott* opinion further overlooked the fact that *Jones v. Integrity Trust Company*

was also cited with approval by this Court in *Bullitt's Estate,* 308 Pa. 413, 420; *Waterhouse's Estate,* 308 Pa. 422, 428; *Hostetter's Trust,* 319 Pa. 572, 575; *Bard's Estate,* 339 Pa. 433, 437; *Steele Estate,* 377 Pa. 250, 254; *Jones Estate,* 377 Pa. 473, 476.

*Bullitt's Estate,* 308 Pa. 413, relied upon by *Arrott Estate,* also holds exactly to the contrary. In that case the Court said (pages 420-421): ". . . there should have been added to the *intact [book] value of 1902,* the *book* value of the 383 shares . . . awarded to the principal; this forms a new intact value as a basis for future distribution; to it should be added the *cost* of the shares purchased since that time, plus any contributed surplus or capital gains. See Waterhouse's Est., 308 Pa. 422.

"The 1928 stock dividend of 100% should be distributed as follows:

| | |
|---|---|
| Intact [book] Value of original 1,150 shares at $145.9259 a share | $167,814.785 |
| Book Value of 383 shares stock dividend of 1918 at $218.332 a share | 83,621.539 |
| *Cost of 62 shares purchased* | 14,836.26 |
| | $266,272.584 |

| | | |
|---|---|---|
| Add thereto | | |
| Contributed surplus per share | $20.31 | |
| Capital gains per share | 5.7004 | |
| | $26.0104 a share | |
| or 1,595 shares equal | | 41,486.588 |
| Total | | $307,759.172 |

for 3,190 shares, being the 1,595 original shares plus stock dividend of 1,595 shares. Each share would have an intact value of $192.92. *After* the 1928 dividend the *book* value of each share was $121.09, and for the

3,190 shares, $386,289.54. The difference, $78,530.37, between the [original adjusted] intact value and the book value [after the dividend] goes to income, which at $121.09 a share [book value] would be 648 shares plus $61.75 in cash as income."

The *Arrott* opinion, misled by the use of the word *"cost"*, i.e., *"cost* of 62 shares purchased, *$14,836.26"*, did not notice what the paper books demonstrate beyond the peradventure of a doubt, to wit, that the word *"cost"* as there used meant *book* value and *not purchase price* or market value. The parties in *Bullitt's Estate* agreed that the purchase price of the 62 shares purchased by the trustees was $9,000 and their *book* value at the time of their purchase was *$14,836.26.* It follows that *Bullitt's Estate,* instead of supporting *Arrott Estate,* holds (though ambiguously expressed) exactly the opposite.

*Hostetter's Trust,* 319 Pa. 572, 181 A. 567, the last case relied upon by *Arrott,* does not support the *new Arrott* rule. In that case a settlor left 1300 shares of the common stock of the Pennsylvania Railroad in trust. The *book* value of each share was $78.60. Eight years later Pennsylvania Railroad granted rights to its stockholders to subscribe to additional shares of stock at the rate of one share of new stock for each 8 shares at a price of $50 (par value) per share. The trustee subscribed for 162 shares and paid $8100 therefor from corpus. On November 27, 1929, the company again gave its stockholders rights to subscribe for additional shares at a price of $50 a share. The trustee subscribed for 183 shares and paid therefor from corpus $9,150. "The *book* value before November 27, 1929 was $96.73 a share and, after the additional stock had been purchased [by subscription], the *book* value of the stock was *$91.65.* So at the completion of the second subscription there were 1,645 shares of stock in the corpus,

with a total value of $150,764.25, while the corpus or intact value [i.e., book value] of the 1,300 shares at the date of the creation of the trust was $102,180."

The Court found that the increase in the value of the shares was *due to earnings* which had accumulated from the date of the creation of the trust to the date of the stock issue, and that the intact value, i.e., *book* value of the corpus, would be preserved by awarding 1304 shares to corpus and the balance to the life tenants. The Court said (page 575) : "We said in Jones v. Integrity Trust Co., 292 Pa. 149, 153, in an opinion by Mr. Justice SIMPSON, 'We now definitely decide that, where a corporation gives to the trustees of an estate the right to subscribe for new stock, *and they avail themselves of such offer,* the benefit resulting therefrom must be apportioned in the same manner as an extraordinary stock dividend would be;* . . .' "

The life tenants would have been entitled to nearly all the stock rights since they represented accumulated applicable earnings. However, the trustees exercised the stock rights, and in exercising these rights paid

---

* The rule as to stock rights has caused far more confusion, conflict and irreconcilability than any other apportionable event. The following cases held that stock rights, or proceeds of sale thereof, belong to corpus and are not apportionable: *Dickinson's Estate,* 285 Pa. 449, 455; *Thompson's Estate,* 153 Pa. 332; *Eisner's Estate,* 175 Pa. 143; *Moss Appeal,* 83 Pa. 264.

The following cases held that stock rights are apportionable and when exercised by the trustee should be apportioned in the same manner as an extraordinary stock dividend (and that prima facie they belong to the life tenant): *Nirdlinger's Estate,* 290 Pa. 457, 478; *Thompson's Estate,* 262 Pa. 278; *Jones v. Integrity Trust Company,* 292 Pa. 149; *Hostetter's Trust,* 319 Pa. 572.

The following case held that the *proceeds of sale of stock rights* were apportionable and should be apportioned in the same manner and have the same presumptions as if they were the proceeds of sale of stock (i.e., they presumptively belong to corpus): *Waterhouse's Estate,* 308 Pa. 422, 429, 430.

the subscription price of $17,250 out of corpus. If, as in that case, the life tenants were entitled to (almost all of) these rights or the proceeds thereof, since they represented applicable earnings, it is certainly equitable and just that corpus should be reimbursed by income for the subscription price which the trustees paid out of corpus for the benefit of the life tenants. While Justice KEPHART'S opinion is not as clear on this point as it might be, it does not support or justify the *Arrott* original intact value rule, as is evident from the following quotation:

". . . In giving to the life tenant the surplus shares—over that necessary to keep the value of the shares at the date of the trust plus that amount expended for purchase of the additional shares— *no harm was done to remainder interests . . ."*

No matter how *Hostetter's Trust* is interpreted, it does not support (we repeat) the *Arrott* opinion that the *original intact value* is (cost or) market value. Even if we assume that *Hostetter's Trust* holds that *original book* value, *plus subscription price paid to a corporation* in exercise of rights to subscribe to stock, is the proper basis for determining the adjusted intact value, *it is a non sequitur to say that original intact value is the original cost to the trustee.* Even more important, if *Hostetter's Trust* had intended to overrule more than a dozen prior decisions of this Court, which had established *book* value as *original intact* value, and if it had intended to establish a new rule, it would certainly and clearly have said (a) that it intended to establish a new and different rule, or (b) that it intended to overrule a dozen prior decisions of this Court, and (c) it certainly would not have quoted with approval from *Jones v. Integrity Trust Company,* 292 Pa. 149, which held exactly the opposite, namely, that *book value* was original intact value in *trustee-*

*purchased* stock, and market value had nothing to do with it.

It is clear from the foregoing analysis (1) that *Arrott Estate* was unsupported by any prior authority of this Court since 1857, and (2) that logically and in principle, it is contrary to more than a dozen prior decisions of this Court (which are hereinabove cited or quoted) on the basic subject of *original intact value* and (3) that it conflicts directly with *Jones v. Integrity Trust Company*, 292 Pa. 149. President Judge KLEIN respectfully expressed it in the present case: "The adoption of purchase price as the determinant for establishing intact value in Arrott Estate was admittedly a *marked deviation* from the established general rule."

We are faced with a dilemma. There is in reality, in equity, and for present purposes, no difference between a decedent-owned and a trustee-purchased stock. For purposes of inheritance tax, estate tax, income tax (gains), orphans' court accounting and surcharge, they are treated exactly *alike*.* Why should they have different yardsticks for an equitable apportionment of dividends or gains on sales—one for decedent-owned and another for trustee-purchased stock? The answer seems obvious—there is no reason, logic, or equity to justify a different yardstick.

In order to solve the "intact value dilemma" we must, once and for all, determine what measuring rod or rods should be adopted (a) for original intact value, (b) for intact value immediately after the date of apportionment, and (c) for purposes of distribution. We shall briefly review several of the dozen different solutions which we are urged to adopt.

1. We can overrule *Crawford Estate*, 362 Pa. and sustain as constitutional the provision of the Principal

---

* Market value at date of death and at date of purchase.

and Income Act of 1947, which states that the Act shall apply (with certain presently irrelevant exceptions) to "all wills . . . theretofore or thereafter made or created." This would eliminate considerable travail for beneficiaries, trustees and Courts and be the easiest solution. The difficulty with this solution is that *Crawford Estate* decided that a life tenant had a vested interest in accumulated applicable earnings even though he was not actually entitled thereto until they were distributed upon the happening of an apportionable event, and this Court has reaffirmed *Crawford Estate* in *Pew Trust,* 362 Pa., *Warden Trust,* 382 Pa., and *Steele Estate,* 377 Pa., and we would have to overrule all of them and completely repudiate the reasoning upon which they were based.

2. (a) We can apply for purposes of *original intact value* the *book* value rule, which has prevailed in Pennsylvania for 80 years, and limit it to decedent-owned stocks, and (b) we can apply the *purchase price* rule of *Arrott Estate for original intact value of trustee-purchased stock.* If such a solution is adopted, we would then have to determine and define the applicable measuring rod for intact value in trustee-purchased stock (a) at the time of the apportionable event, and also (b) for purposes of distribution.

It is impossible to reconcile in principle, in logic or in equity the new *original* intact-market value rule of *Arrott Estate* with over a dozen decisions of this Court covering a period of 80 years which had established and maintained *book value* as *original* "intact value", and had held over and over and over again that (so far as the Apportionment Rule is concerned) *market value was inapplicable.* Every banker and every stock broker and nearly every owner of stocks know that the market value of a stock is often 5 to 15 times greater than its book value; that it is some-

times less than its book value; and that market value—which fluctuates much more frequently and much more widely than book value—is not nearly *as accurate a criterion of earnings* as is book value. Furthermore, the drastically different and inequitable results which will often be produced by applying the original intact-market value rule of *Arrott Estate* in trustee-purchased stocks, and the original intact-book value rule of a myriad of other cases dealing with decedent-owned stocks of the same corporation (and sometimes the same trust estate) is strikingly apparent from the following example:

Mr. Smith dies on March 20, 1952, leaving two trust estates, one to pay the income to his wife for her life, and the other to pay the income to his daughter for life. The portfolio of the daughter's trust includes 1,000 shares of a chemical company, the book value of which at decedent's death was one-tenth of its market value. On April 1, 1952, the testamentary trustee purchased for the wife's trust 1,000 shares of the same chemical company at approximately the same price as the market value was on the date of decedent's death. The book value was the same on March 20 and April 1, 1952. In May of 1957 the company declared an extraordinary stock dividend of 50% which was payable wholly out of earned surplus, which had accumulated since April 1, 1952. In apportioning this extraordinary stock dividend in the estate for Mr. Smith's wife and in the estate for Mr. Smith's daughter, his widow would receive (if *Arrott Estate* is followed) a small fraction of what his daughter would receive.

As President Judge KLEIN, speaking for the Orphans' Court in *Cunningham Estate,* said: "The unpredictability of the Pennsylvania Apportionment Rule is well illustrated by comparing the present case with Harvey's Estate (O. C. Phila.) No. 3165 of 1940, in

which an opinion has been filed of even date herewith. In that case the trustee acquired decedent owned shares of General Electric Company stock in 1939, a few months after the trustee purchased shares of stock of the same company in this case. The distribution in the Harvey case is drastically different from the one in the present case because decedent owned shares were involved."

3. In apportioning extraordinary dividends and gains on the sale or liquidation of stock, we can apply a uniform fixed rule or standard or yardstick or measuring rod, to wit, *book value,* for determining intact value in decedent-owned stocks and in trustee-purchased stocks, not only at the time of acquisition, (with proper adjustment, whenever necessary, for subsequent capital increases or capital losses), but also immediately after the apportionable event, and for purposes of distribution.

President Judge KLEIN wisely said: "But whether book value or market value is to be used for the determination of the arithmetical calculation we are now discussing, is not, of itself, nearly so important, in our opinion, as *the adoption of a fixed standard which trust administrators can hereafter use as a dependable guide."* Judge LEFEVER, in his dissenting opinion aptly said: "There is a time when accomplishment of real justice *requires the exactness and sureness of a precise and workable rule* rather than the ephemeral will'o'the wisp of an equitable doctrine which requires constant re-definition. Lord Coke's famous aphorism is apposite, '. . . the knowne certaintie of the law is the safetie of all.' "

It is high time that clarity, certainty and uniformity be substituted for variety, conflict and confusion. We are convinced that there is no reason, logic, equity or justification for adopting (1) one rule or

standard or yardstick to determine *original* intact value in decedent-owned stock, to wit, *book value,* and an entirely different rule or standard or yardstick for *original* intact value in trustee-purchased stock, to wit, *market value,* or (2) one rule or standard or yardstick to determine (a) original (and adjusted) "intact value" and (b) a different rule or standard or yardstick for "intact value" (immediately) after the apportionable event, (which is used to aid the Court in preserving the original adjusted "intact value"), and/or (3) a different rule or standard or yardstick for purposes of allocating and distributing to the life tenant the exact number of shares to which he is (under the above mentioned authorities) equitably entitled. The same fixed *uniform basic* standard or rule or yardstick or measuring rod for "intact value" should obviously and unquestionably be used (1) for decedent-owned and for trustee-purchased stock, and (2) in each of the above mentioned instances.*

Reason, experience, stability, equity and a host of authorities demonstrate that the fairest, the *most stable* and *the most equitable* standard, yardstick or measururing rod *for determining* between life tenant and remainderman, an *equitable apportionment of net earnings*—which have been distributed in an extraordinary stock dividend, or which are included in the gain resulting from a sale of stock or liquidation of a corporation—is *book value* and not market value. We should, therefore, have the courage and the wisdom to admit our mistake and overrule *Arrott Estate,* 383 Pa. 228; and we should adopt *book value* as intact value in all instances* and for all purposes in both decedent-

---

* Except where fraud or bad faith is shown in the corporate bookkeeping, or the corporation has made a material change in valuing its corporate assets between the date of acquisition of the stock and the apportionable event.

owned and trustee-purchased stock whenever an extraordinary stock dividend, or gains on the sale or liquidation of stock are subject to apportionment.

With respect to the 100% stock dividend declared and paid by Gulf Oil Corporation, the rule may be thus succinctly stated: When an extraordinary stock dividend is paid partly out of contributed or paid-in surplus, and partly out of *applicable* earned surplus, so much of the latter as is capitalized and is not required to preserve the adjusted intact book value belongs to the life tenants and all the rest of the stock dividend belongs to corpus.

I would reverse the Decree of the Court below, and I would remand the case to the Orphans' Court with directions to enter a Decree and a Schedule of Distribution in accordance with this opinion; and I would direct that the costs be paid out of the principal of the trust estate.

Mr. Justice MUSMANNO joins in this opinion.