## Drexel Estate (No. 2)

*Charles J. Biddle*, for accountants.

*Paul Maloney*, for claimant.

*J. Harry LaBrum*, for guardian and trustee ad litem.

162

KLEIN, P. J., May 4, 1961.—Anthony J. Drexel died on June 30, 1893, leaving a will and codicils by which, inter alia, he directed that his residuary estate should be held by his executors and trustees in trust to pay the income to his children and their descendants, other than the children of his deceased daughters, Emily Biddle and Fanny Drexel Paul, in equal shares, per stirpes, until 21 years after the death of his last surviving child and grandchild living at the time of his death, with power in his children to dispose of $200,000 of the principal of such child's share by will, and with the further direction that the share of the principal of any person dying without issue living at their respective deaths should fall back into the residue; and with the further direction that, upon the termination of the trust, the principal should be distributed in equal shares, per stirpes, to his then living descendants, other than those of the said Emily Biddle and Fanny Drexel Paul, for whom he established separate trusts, the details of which need not be recited in this adjudication, except that if all of the beneficiaries thereof should fail during the term of the trust of the residue, the principal of the said trusts should fall into the trust of the residue.

The fund presently accounted for was awarded to the present accountants by adjudication of Hunter, J., dated December 5, 1949, and the present account is stated to have been filed in order to render an accounting since the last previous account and because of the death on July 7, 1958, and on July 7, 1959, respectively, of two of the trustees, A. J. Drexel Paul and Livingston L. Biddle, as well as the death of several beneficiaries who have from time to time been entitled to income. . . .

The trustees' notice of the audit, dated April 19, 1960, and presumably sent to all parties in interest, contains the following statement:

"Where bonds have been purchased at a premium above their face value or above the price at which they may be called for payment, the Trustees (with the exception of some cases in which the premium was three points or less) have credited principal and charged income as received with sums sufficient to reduce the carried value of such bonds on the books of the Estate to the figure at which they may be called or redeemed as the case may be, in order that the principal of the Trust may not be depleted. The Trustees have been notified by a representative of one of the beneficiaries of the Paul Trust that this practice will be objected to and that the Court will be requested to direct that income be credited with the full coupon rate of interest without amortization. It will be the position of the Trustees that the amorization of such premiums out of income is sound and should be continued as in the past."

It is the practice of the trustees now, and has been for the entire period of the present accounting, when they purchase bonds at a price above face value, to amortize the premiums so paid out of income to the date of their respective maturities or the date when the bonds are called for payment, generally at 100, whichever is earlier. This is done by charging income periodically, as receiving, and crediting the amount to an amortization reserve. As such bonds are sold or paid off, the premium paid upon them is charged against this reserve and the amount of any profit or loss, after providing for amortization, is credited or charged to principal, as the case may be.

Louis C. N. Drexel, who has a present interest in one-ninth of the income and a contingent interest in a stirpital share of the principal, objects to amortization out of income in any amount, and contends that all premiums must be borne by principal alone. He therefore insists that the entire sum of approximately

$650,000 expended for premiums, which was charged to income and credited to the amortization reserve during the period covered by the present accounting, should be distributed to the income beneficiaries.

He relies, in support of his position, primarily upon the provisions of section 6 of the Uniform Principal and Income Act of May 3, 1945, P. L. 416, reenacted in the Principal and Income Act of July 3, 1947, P. L. 1283. Mr. Drexel contends, further, that if the Principal and Income Acts cannot be applied retroactively, the case law in effect prior thereto is the same as the rule set forth in the statutes.

Mr. Biddle, on behalf of the accountants, and Mr. LaBrum, the guardian and trustee ad litem, challenge Mr. Drexel's contention, and maintain (1) that the two Principal and Income Acts cannot be applied retroactively, and (2), that the premiums paid were exclusively for the benefit of the income beneficiaries and therefore the practice of amortization adopted by the accountants was proper and in accordance with accepted principles of law.

Our first problem, therefore, is to determine whether the provisions of the Uniform Principal and Income Acts of 1945 and 1947 are applicable to the present estate. Section 6 of the Act of May 3, 1945, reenacted verbatim in the Act of July 3, 1947, reads as follows:

"Section 6: Premium and Discount Bonds.—Where any part of the principal consists of bonds or other obligations for the payment of money, they shall be deemed principal at their inventory value, or in default thereof, at their market value at the time the principal was established, or at their cost where purchased later, regardless of their par or maturity value, and upon their respective maturities or upon their sale, any loss or gain realized thereon shall fall upon or enure to the principal. . . ."

If the acts apply, there is no problem. Under the

clear language of section 6, all premiums paid for the purchase of bonds must be borne by principal.

Our study of the question, however, satisfies us that a retroactive application of the acts would be unconstitutional. In Crawford Estate, 362 Pa. 458 (1949), our Supreme Court held unequivocally that the two Uniform Principal and Income Acts violate article I, secs. 1 and 9 of the Constitution of Pennsylvania and the fourteenth amendment of the Constitution of the United States, when applied to trusts created before their effective dates, with respect to ascertainment and distribution of accumulated corporate earnings and profits.

Mr. Justice Stearne, speaking for a unanimous court, said page 463:

"A gift of an equitable life estate in *income* is a grant of *a vested property interest.* The Legislature may not thereafter qualify or extinguish it."

This principle has been steadfastly reaffirmed by the Supreme Court. For examples, see Pew Trust, 362 Pa. 468 (1949); Steele Estate, 377 Pa. 250 (1954); Jones Estate, 377 Pa. 473 (1954); Warden Trust, 382 Pa. 311 (1955); Cunningham Estate, 395 Pa. 1 (1959).

Admittedly, all of these cases involved questions dealing with the respective rights of beneficiaries of principal and income under the so-called Pennsylvania Apportionment Rule, arising from possession of shares of stock of corporations. In our opinion, however, the principles of law are equally applicable to the instant situation. The life tenants' right to receive the income earned by a trust estate, undiminished by unwarranted deductions paid for premiums in the purchase of bonds by the trustees, is as much a vested right as the right to apportioned earnings on shares of stock held by the trust estate and cannot be abrogated or diminished by the Legislature. We, therefore, conclude

that neither the Uniform Principal and Income Act of May 3, 1945, nor the Principal and Income Act of 1947, is applicable to the present case.

Accordingly, we must examine the law as it existed prior to the enactment of these statutes to obtain the answer to the questions submitted by the parties to this litigation.

In Penn-Gaskell's Estate (No. 2), 208 Pa. 346 (1904), the court said:

"That premiums paid on investments are to be charged to principal and not to income was decided by the orphans' court of Philadelphia in Furness's Estate, 12 Phila. 130, nearly thirty years ago and has since been the rule in that court, and as far as we know the rule followed generally in the state. It was recently approved after careful consideration by the Superior Court in Boyer v. Chauncey, 12 Pa. Superior Ct. 526. On the whole we think this is the better rule. It apportions more equitably than any other the charges which each interest in the estate should bear for the preservation of the principal, and it prevents the positive injustice of charging the life tenant for a loss which may never be incurred. . . ."

The court recognized an exception to this general rule, and said, page 348:

". . . If premiums were paid to secure greater income, they should be charged of course to the life tenant, because he could be the only party benefited by the payment. . . ."

In Catherwood's Estate, 22 Dist. R. 517 (1913), this court recognized both the rule and the exception. Dallett, P. J., the Auditing Judge, said, page 520:

". . . the test must be, were the investments made to secure greater income or for safety and permanency of investment?"

In that case premiums were paid on bonds yielding, variously, five percent, six percent and seven percent.

Judge Dallett said further, page 520:

"And taking into consideration all the facts in connection with the investments in this estate, the value of the assets at the time the securities were turned over to the trustee and their present value, the auditing judge is of the opinion that the premiums paid on the bonds paying 6 and 7 percent should properly be charged against income and the premiums on the bonds producing 5 percent or less should be charged against principal."

Exceptions to the adjudication were dismissed in an opinion by Anderson, J., who said at page 521:

"In judging, therefore, whether the premium was paid for the purpose of enlarging the income or of securing the fund, it is essential that the rate should be ascertained beyond which it is apparent that the purpose of paying the premium was to secure a larger return than is usual in investments of trust estates, and, where that rate is increased, to charge the premium so paid to the income thus benefited."

The rule was again reaffirmed in this court in 1955 in Neafie Estate, 5 Fiduc. Rep. 291, in which our late colleague, the scholarly and beloved Judge Hunter, said, page 293:

". . . The premium paid was not to secure greater income, but to protect and preserve the principal. The will makes no provision for amortizing the premium out of income, and it is reasonable to suppose that testator intended it should be paid out of principal. The general rule is that premiums on investments are to be charged against principal, because the life tenant is the primary object of the testator's bounty, where such premiums do not represent higher interest, but safety and permanency of principal: Penn-Gaskell's Est., 208 Pa. 346; Close Est., 3 Fiduc. Rep. 113. . . ."

See also Lafferty's Estate, 23 Dist. R. 327 (O. C., Phila., 1914); Estate of Henry H. Houston, O. C.

Phila., no. 5, Jan. term 1896, not reported. See, also, Trexler's Estate, 32 D. & C. 427 (1938), in which the court ruled that premiums were properly charged against income in a perpetual charitable trust because it could be presumed that the testator's primary purpose was to maintain principal intact.

Mr. Biddle and Mr. LaBrum place great reliance upon the language used by testator in the will and upon the assertion of Mr. Gowen, one of the trustees, that tax exempt bonds were purchased at premium in order to benefit the income beneficiaries.

Testator in article thirteenth, paragraph 3, of his will, in which he defined the investment powers of the trustees said:

"They shall have the right to invest and re-invest the funds which may at any time come into their hands, in first class railroad mortgage bonds, of Companies whose railroads are finished, and earning interest on their entire bonded debt, and also in State, Municipal or Corporation bonds, whether of a public or private character, in real estate yielding an income, and in such securities as are considered lawful and valid investments for Trustees in the State of Pennsylvania, *but I wish them in all instances to look to the security of the investment rather than the rate of income.*" (Italics supplied.)

From this admonition counsel for the accountants and for remainder interests argue that, since the trust was created for the protection of testator's family for the maximum period permissible by law, his primary purpose was to preserve the principal intact and not to secure a large income for the life tenants.

Because Mr. Gowen stated that the high premiums were paid for the benefit of the income beneficiaries, and no witnesses were called to contradict this statement, Mr. Biddle apparently takes the position that this is binding upon the court. We cannot accept this

premise. It is readily conceded that Mr. Gowen is an eminent lawyer and banker and recognized as an expert in the field of investments. This does not, however, change the fact that he is appearing in the present case as one of a group of fiduciaries, endeavoring to justify the administration of a trust estate in their care. Regardless of what reason he advances for the trustees' course of action, it is for the court, and not for him, or his counsel, to decide the legal effect of this action. This is particularly so, because the general rule of law directs that premiums paid on investments be charged to principal. In order to come within the exception to the general rule, the remaindermen are confronted with the burden of establishing that the premiums were paid solely for the benefit of the income beneficiaries. To determine whether this burden has been met is the court's responsibility and cannot be assumed by the trustees or their counsel.

The law is well settled that a trustee must act with due regard for the best interests of all parties affected by the trust, income beneficiaries and remaindermen alike. In Thompson's Estate, 262 Pa. 278 (1918), Justice Simpson said, page 281:

"A trustee has no right to take sides as between the life tenants and remaindermen. If he has an election of taking one of several courses, he must take, if possible, that which will not benefit one at the expense of the other."

See also Buist's Estate, 297 Pa. 537, 542 (1929); King Estate, 355 Pa. 64, 78 (1946), dissenting opinion; Restatement of Trusts, §183; Skilton, The Rights of Successive Beneficiaries in Unproductive Trust Assets Not Bearing Interest (1941) 15 Temp. L. Q. 241; Hilinski, Unproductive Trust Property and Principal Income and Expense (1941), 89 Pa. L. R. 1081.

As examination of the accountings in this estate indicates clearly that the trustees have acquitted their

responsibilities in this regard in a praiseworthy manner. They have performed their duties well and should be commended therefor. However, the auditing judge is of the opinion that they have taken an extreme and one-sided position with respect to the manner in which the premiums in question should be allocated.

A study of Mr. Gowen's testimony does not support Mr. Biddle's contention that the investments in bonds purchased at premium were made exclusively for the benefit of the income beneficiaries. As a matter of fact, if this were true, it would be a dangerous policy for the trustees to pursue and could readily result in surcharge, in view of the testator's clear admonition that they should "in all instances look to the security of the investment rather than the rate of income." During the course of his examination, Mr. Biddle asked Mr. Gowen, page 17:

"Q. Would you explain to his Honor what the purpose of the trustees was in buying bonds at substantial premiums? In other words, was it done in order to obtain a better rate of interest? Was it done in order to obtain a higher degree of security in the particular investment? Just what was the purpose?"

Mr. Gowen answered:

"A. I think it served both purposes, Mr. Biddle. . . ."

Later, in cross-examination by Mr. Maloney, Mr. Gowen was asked:

"Q. How would you distinguish between a premium on a bond which exists because of income rather than one which exists because of security of the principal?"

Mr. Gowen's answer was:

"A. I think they are inter-related."

Certainly, this does not sustain the contention that all bonds purchased at a premium were acquired solely for the benefit of the income beneficiaries. On the contrary, it indicates that the trustees, in the proper discharge of their responsibilities, considered the interests of both life tenants and remaindermen.

But where does consideration for the income beneficiaries end and concern for the remaindermen begin? Where do we draw the line? This poses a difficult problem.

The trustees must act with due regard for the rights of both classes of beneficiaries and there is an area where these interests merge. Moreover, in trusts of long duration, such as this one, the factors controlling the situation may change as economic conditions change. Actually, they may be different as each investment is made. It is, therefore, difficult to establish a general rule to cover every purchase. Yet to treat each transaction as sui generis would create a serious administrative problem in an estate of this size. Accordingly, we must attempt to formulate a rough and ready rule which will meet the practicalities of the situation and, at the same time, be reasonable and equitable to all interested beneficiaries.

We must, therefore, try to ascertain to what extent these purchases were made for the benefit of the income beneficiaries, and to what extent they were made to protect and preserve the principal. The trustees in this case were confronted with a complex situation. The various trusts they are administering under testator's will are very large, totaling about $30,000,000 in the aggregate. As a consequence, almost all of the income beneficiaries are in very high income tax brackets. If the trustees had not invested in tax-exempt bonds, the net expendable income available to the heirs would no doubt be greatly reduced by the impact of taxes. It was only natural, under the circumstances, for the trustees to give serious consideration to this most important factor. Bearing in mind the limitation upon the investment powers of the trustees, it seems fair to conclude that the premiums were paid primarily, but not entirely, for the benefit of the income beneficiaries.

The detailed summary of the bond purchases by the

trustees over the period of this accounting, submitted to the auditing judge and made part of the record, indicates that some bonds were bought at substantial discounts, whereas premiums in excess of 50 percent were paid for others. We can assume that when the trustees acquired bonds of a face value of $10,000 of the Golden Gate Bridge and Hwy. four and three-quarter percent, due July 1, 1968, in 1945, and paid a premium of $5,158.08 therefor, the payment of this very high premium was primarily for the benefit of the income beneficiaries. But can this be said of the purchase in 1947 at $102.50, of $59,000 of the bonds of the Commonwealth of Pennsylvania Turnpike Rev. two and one-half percent due December 1, 1976, for $60,475, the premium paid being $1,475? We think not. In our opinion, we can fairly conclude that the latter purchase was in compliance with testator's direction "to look to the security of the investment rather than the rate of income."

It appears that Mr. Biddle's partner, Mr. Drinker, at the request of the trustees, furnished them with several opinions with respect to this question of amortizing the premiums paid by them in connection with the purchase of bonds.

Mr. Gowen testified, page 15:

"A. Well, then, prior to the first date of the present accounting (1945) this question before the trustees had been submitted to counsel for their advice and the trustees were advised that in the opinion of counsel those premiums should be amortized down to 103 or to the higher call date of the bond, and that was the practice.

"Subsequently, the matter was resubmitted to counsel, and the trustees were advised it would be more desirable to amortize premiums down to par. That is the practice that the trustees followed for at least twenty-one years."

The auditing judge is of the opinion that the former practice of the trustees, based upon counsel's advice, of amortizing the premiums to 103, or to the higher call price of the bonds, was not only fair and sensible, but an intelligent solution of the difficult problem confronting the trustees, in view of the general rule of law directing that all premiums paid on investments are to be charged to principal. The auditing judge is of the opinion, further, that the change in practice to amortizing the premiums to par, in accordance with counsel's later opinion, was unwarranted and wrongfully prejudiced the rights of the income beneficiaries. We so find, and direct the trustees to refund to income beneficiaries thereunto entitled, or their estate, if they be deceased, all premiums amortized below 103 or below the call price of bonds which were called, if such call price was higher than 103, during the period of this accounting. The calculations giving effect to this order are directed to be shown in the schedule of distribution, which the accountants will be directed to file.

The testimony disclosed that when bonds were purchased at a discount and were later sold for a figure above the purchase price, or were paid off at their face value upon maturity, the gain was credited to principal. Counsel for the income beneficiaries contended at the hearing that this practice was unfair, claiming that if income is to be charged with premiums, they should receive the benefit of discounts. The auditing judge at first thought that there might be some merit to this position, but, upon reflection, has concluded that the practice adopted by the trustees is correct and proper under all of the circumstances, and the account will be confirmed, as stated, in this regard. . . .

And now, May 4, 1961, the account is confirmed nisi.