Dilks  Estate

2

*C. Leo Sutton* and *William J. Henrich, Jr.,* for accountants.

*Henry D. Paxson,* for life-tenants.

*James H. McHale,* guardian-trustee ad litem.

SHOYER, J., July 26, 1962.—This trust arises under the will, a copy of which is hereto annexed, of Walter H. Dilks, who died April 9, 1933, whereby testator, by Item VIII thereof, gave his residuary estate to his trustees, in trust, to pay one-half the net income therefrom to his wife, Clara D. Dilks, for life, and the other one-half of the net income, and after his wife's death all of the net income, to each of his three sons, Walter Howard Dilks, Jr., John Hyland Dilks and William A. Dilks, during their respective lives. Upon the death of any of his sons, to pay his share of the income to *testator's* descendants and/or the widow of such deceased son in such proportions and for such estates as such deceased son shall by will appoint, until expiration of the trust 20 years and 11 months after the death of testator's last surviving son, and, in default of appointment by a deceased son, then that share of income shall be paid to such deceased son's issue, per stirpes, until the expiration of the trust, and in default of appointment and issue then the share of income be paid to testator's issue, per stirpes, and upon the termina-

tion of the trust to pay the principal to such of testator's descendants and in the same proportions as immediately prior thereto were entitled to the income.

Testator was survived by his widow, Clara D. Dilks, and by his three sons, William, Walter, Jr., and John.

Clara D. Dilks, the widow of testator, died July 30, 1935.

The fund being here accounted for was awarded "without prejudice to the rights of unborn issue and contingent remaindermen", by the adjudication of Judge Klein, dated June 15, 1936, to Fidelity-Philadelphia Trust Company and Walter H. Dilks, Jr., trustees, in further trust for John Hyland Dilks, William A. Dilks and Walter Howard Dilks, Jr.

This, the "Second Account" by the trustees, is an "interim accounting", filed for confirmation of transactions stated therein for the period from April 22, 1936, to October 16, 1961 . . .

John Hyland Dilks, William A. Dilks and Walter Howard Dilks, Jr., are each sui juris, and the trust continues. Annexed hereto are the separate waivers by each of the life-tenants of a full accounting of income for the period prior to September 2, 1961.

It appears from the statement of proposed distribution that testator has four grandchildren: John Hyland Dilks, Jr., who is sui juris, and Charles Day Dilks, Peter Durfor Dilks and Anne Dunning Dilks, who are minors.

By decree dated November 27, 1961, pursuant to petition filed by the accountants, I appointed James H. McHale, Esq., guardian ad litem for the aforementioned minors, and trustee ad litem for persons unborn and unascertained, to represent those interests in connection with the audit of this account.

The guardian-trustee ad litem has filed his report and a supplemental report, which are hereto annexed. The report reviews the history and provisions of the

trust, the parties in interest, an analysis of this account and of the prior account which was confirmed without prejudice, and raises certain questions and makes recommendations in resolving these questions. The questions raised by Mr. McHale involved: . . . (2) abandonment of "worthless securities"; (3) proposed apportionments from principal to income as to transactions occurring prior to May 3, 1945 . . . and (5) allocation of costs of accounting. The questions so raised will be considered and disposed of in the order presented . . .

## 2. *"Abandonment" of Worthless Securities*

The guardian-trustee ad litem in his report points out that on pages 6, 7, 8 and 9, of their account, the accountants take credit for removal from the account of a number of securities, which were awarded to them from their prior account, as being "worthless". While not attributing any fault to the accountants because of these "worthless assets", he questions their removal from this trust account to the "corporate trustee's 'worthless Ledger' ". The report cites section 932 of the Fiduciaries Act of April 18, 1949, P. L. 512, which provides:

"When any property is so burdensome or is so encumbered or is in such condition that it is of no value to the trust, the trustee may abandon it. When such property cannot be abandoned without transfer of title to another or without formal renunciation, the court may authorize the trustee to transfer or renounce it without consideration if it shall find this will be for the best interest of the trust."

The Joint State Government Commission's comment to this section suggests that this section be compared with section 502 of the same act dealing with somewhat similar powers conferred on the personal representative.

In requesting approval of the procedure adopted by the accountants, their counsel cite Pearlman Trust, 348

Pa. 488, 491. Examination of the Pearlman case cannot be considered as approving the transfer of "worthless assets" from the trust estate to the trustee, *individually.*

It does not appear that the retention of the "worthless" assets imposes any financial burden on the trust or imposes any hardship in connection with its administration. As noted in Pearlman, "if a fiduciary abandons an interest in personal property, he relinquishes it with the intention of terminating his interest in it and without intending to vest ownership in another . . . Abandonment is therefore inconsistent with sale or gift which involve intention to transfer title to the buyer or the donee." This is especially so when, as here, the transfer is to the trustee in its individual capacity. This procedure is not approved. The "worthless" securities itemized on pages 12 and 13 of the report will be charged back to the account at their respective accounting values.

### 3. *Proposed Apportionments from Principal to Income as to Transactions Occurring Prior to May 3, 1945*

The accountants' notice to the parties recites, inter alia, "It is the view of the Trustees, in the light of the decision in the Catherwood Trust, 405 Pa. 61, that there are apportionable items of $99,560.88, of which $76,603.22 belongs to principal and $22,957.66 belongs to income." These "apportionable items", as noted in the statement of proposed distribution and in the schedule marked "Exhibit I", which was submitted at the audit, involve transactions which *were completed prior to May 3, 1945.* These "apportionable items" are discussed by the guardian-trustee ad litem in his report, pages 13-16. Exhibit I lists 27 varied securities which, on diverse dates between 1936 and May 3, 1945 (within the early part of the accounting period), were sold at a gain or as to which stock dividends or rights to sub-

6

scribe to stock of the issuing corporation were received. The report states (page 14): "The $22,957.66 which they propose to allocate to income falls into the following categories:

| | | |
|---|---|---:|
| Proceeds of sales of rights to subscribe | $ | 121.61 |
| Stock dividends (stock of the issuing corporation) — (proceeds) | | 2,416.39 |
| Gains on sales of securities (to the extent) | | 20,419.66 |
| | | $22,957.66 |

"As to the $121.61 proceeds of sale of rights to subscribe and the sum of $2,416.39, proceeds of the sales of stock received as regular stock dividends of the issuing corporations, those receipts are supported by the 'retained earnings' of the respective corporations and their allocation to income does not impair the 'intact value' of those investments. There is a *presumption* that those rights and those stock dividends belong to income and in spot checking the calculations the undersigned would be unable to refute those allocations: Earp's Appeal, 28 Pa. 368 (1857); Hostetter's Trust, 319 Pa. 572; Cunningham Estate, 395 Pa. 1 (1959).

"The guardian-trustee ad litem protests the proposed allocation to income of the $20,419.66 gains on sales of securities. While it may be conceded that the proposed allocation by the accountants is limited by them to the 'retained earnings' of the respective corporations . . . such consideration falls far short of the requirements of the Pennsylvania Rule: McKeown's Estate, 263 Pa. 78 (1919); Nirdlinger's Estate, 290 Pa. 457 (1927); Waterhouse's Estate, 308 Pa. 422 (1932); Catherwood Trust, 10 Fiduc. Rep. 425 (1960)." . . .

In his supplemental report (pages 2, 3), Mr. McHale explains some of the differences in the totals recited in the two schedules. It appears that the trustees

received a total of 103.77 shares of Sun Oil Co. stock dividends, which shares were sold for $5,851.77, and that schedule 1 erroneously recited $2,416.39 as the proceeds. In his supplemental report, the guardian-trustee ad litem *agrees* that the $121.61 proceeds of sale of rights, and the sum of $5,851.77, *a total of $5,973.38* of the pre-1945 transactions, may properly be allocated to income. It thus appears that the sum of $18,105.12 ($24,078.50, total sum proposed by accountants as apportionable to income on schedule "Exhibit 2" of stipulation, less $5,973.38, admitted as apportionable by the guardian-trustee ad litem, representing gains on sales of securities) remains in controversy.

The accountants produced Richard L. Horter, who, as apportionment expert for the corporate fiduciary, supervised the calculations involved in the preparation of the schedules. Mr. Horter testified that with respect to the sale on February 9, 1937, of 100 shares of American Can Company, which resulted *in a gain of $1,649.30*, the sum of $1,069.30 should be retained in principal, and the sum of $716 should be apportioned to income. Mr. Horter testified that in making the apportionment calculations, the financial statements of the American Can Company (and of each of the other corporations involved) were examined and analyzed; in each case, there was "allocated to principal sufficient to preserve intact value"; that adjustments were made where there were changes in the capital structure of the corporation; that adjustments were made in such way that the income beneficiaries were not benefiting by some capital asset; that there were accumulated earnings during the period the security was held in this particular trust sufficient to cover the amount allocated or apportioned to income; that in his revised schedule of apportionment (stipulation, exhibit 2), he excluded consideration of any special reserves in determining the amount of earned surplus.

Mr. Horter admitted that of necessity he had *assumed*—"an assumption which we have to make"— that the entire earned surplus of the company was available for dividend distribution. In cross examination, he testified that his apportionment calculation with respect to the American Can Company gain was made by him in August, 1960, and the recalculation was made in February, 1962; that he did not discuss the recalculation with anyone at the office of the corporate trustee, but in the past the corporate trustee's apportionment calculations included "equity reserves", and this recalculation was made to exclude any reserves.

Mr. Horter's testimony as to the other gains on sales completed prior to May 3, 1945, as summarized in accountants' exhibit no. 2 attached to the stipulation, was along the same tenor as with respect to the American Can Company sale. The separate calculations made by Mr. Horter as to each security sold are shown on the accountants' exhibits 3 to 29 attached to the transcript, pages 70 to 96.

It is the accountants' contention that as to these pre-1945 gains on sales, the testimony of this witness plus the exhibits require that the sums aggregating $18,-105.12 are properly apportionable by them to income. They contend that they have fully met the burden of proof imposed on the life tenants by McKeown's Estate, supra; Nirdlinger's Estate, supra, and Waterhouse Estate, supra. The trustees and the life-tenants here contend that unlike Catherwood Estate, where there was an *accounting loss* on the sale there in question, in the instant matter each of the sales resulted in an actual gain over account value.

Be that as it may, as noted in the guardian ad litem's report, President Judge Klein in his adjudication in Catherwood Estate, 22 D. & C. 2d 701 (1960), quoted with approval from Waterhouse, at page 712: " 'Where stock that produces income owned by the estate is sold

for a price greater than the intact value (as defined and considered above) and such greater price is due to an accumulation of income, the proceeds are apportionable; that is, so much of the proceeds as necessary to preserve the intact value (as defined) goes to the trustees for the corpus, and only so much of the balance that represents income goes to the life tenant.

" 'But where the greater value is due to the stock's earning power, good will, or its intrinsic, speculative, or enhanced market value, *all* the proceeds are part of the corpus and belong to the remaindermen; the increase is capital gain.

" '*The presumption is that the proceeds from the sale of stock belong to the corpus of the trust and the burden of proving that they do not rests on the person asserting a claim to them.*' " (Italics supplied.) . . .

"A corporation, in the ordinary course of the operation of its business, does not retain sums representing accumulations of earnings in cash, uninvested. If such earnings are not distributed to the shareholders as dividends, they are usually mingled with the other assets of the corporation. We, therefore, cannot say with certainty what portion of the proceeds of the sale of the shares was due 'to the stock's earning power, good will or its intrinsic, speculative or enhanced value' and what share was due to the fact that the corporation had on its books undistributed accumulated earnings. Since the presumption is that the proceeds of the sale belong to corpus, we must conclude that the life tenants have failed to meet the burden which the law places upon them of proving their right to the earnings to which they make claim."

In Cunningham Estate, supra, involving, inter alia, an exchange and conversion of General Electric Company "stock dividend" necessitating the capitalization of corporate earnings, the majority opinion by Mr. Justice Benjamin R. Jones observed, page 11:

"In recent years the ingenuity of corporate management, seeking to achieve various ends such as broadening or enhancing the market for its stock, effect tax savings, etc., has produced a complexity of corporate transactions which involve the transfer on corporate books of earnings, earned surplus, etc., from one account to another. Earnings, under modern corporate practice, no longer retain the simplicity of meaning of the earnings considered by this Court in Earp's Appeal, supra, and other decisions."

And at page 13:

"Under modern corporate methods, however, such accounts [which corporate management labels as reinvested earnings, earnings, earned surplus, etc.] may be and are set up for various and sundry reasons, for example, to cover future expansion, cost of equipment, future contingencies, or reserves for losses in business, etc., and that which is labeled 'earnings' may and often does represent items other than income, such as capital gains."

It is fair to assume that it was because of the uncertainty as to the source and composition of the "surplus" account of American Can Company, and of the capital accounts of the other corporations, that Mr. Horter in his recalculations omitted those accounts from his calculations. However, Mr. Horter was unable to say, and the accountants have not shown, that the "retained earnings" of the American Can Company or of the other securities sold were earmarked "solely" for distribution to stockholders or that the "retained earnings" to the extent to which they would apportion the proceeds of the sales, do not include capital gains on the invested fund. See Cunningham Estate, supra, pages 12 and 13.

The life-tenants here have not met their *full* burden imposed on them by the applicable decisions. The portions of the gains which they propose to allocate to

income have not been shown to belong to income, and must remain in principal . . .

### 5. *Allocation of Costs of Accounting*

The guardian-trustee ad litem's report objects to the credit taken by the accountants for payment out of *principal* of the sum of $2,750 fee to counsel for the accountants, and $200.75 costs of filing the account. He also objects to the payment requested by the corporate fiduciary of $1,700 out of principal for preparing the apportionment calculations. He admits that the charges are reasonable and proper, but contends they should be paid out of income. The report points out that the *same trustees-accountants* and the *same life-tenants* are before the court now in connection with this interim account as were before the court in connection with the prior trustees' account confirmed in 1936, without prejudice. He suggests that the discretion which section 11 (2) of the Principal and Income Act confers on the court as to apportionment of attorneys' fees and costs, be applied to impose these charges on the life-tenants. He cites Spangler's Estate, 21 Pa. 335; Butterbaugh's Appeal, 98 Pa. 351; Crawford's Estate, 256 Pa. 504.

The principal balance, $639,923.25, having an aggregate market value as of October 16, 1961, of $1,343,535.25, with the apportionment problem already recited, easily justifies and supports the reasonableness of the amounts of the respective charges just mentioned.

It seems evident to the auditing judge that the accounting and audit was necessary and desirable for the proper *administration* of the trust, especially after a lapse of more than 25 years since the confirmation of the last accounting and in view of the recent ruling in Catherwood. The accounting and audit, with all parties represented, serve to settle the rights of the

life-tenants as well as the remaindermen and are, therefore, of incalculable benefit to all parties in interest. The application of the ruling in Catherwood, reversing the holdings in Crawford, Pew and Warden, as to the application of the Principal and Income Acts, results in substantial loss to the life-tenants, the immediate objects of testator's bounty, who, because of that decision, are deprived of benefits they would have received under the Pennsylvania Rule of Apportionment. In the circumstances, it would be more equitable that the costs of filing the account, cost of making the apportionment calculations, and the fee of counsel for the accountants be charged one-half to principal and one-half to income, and it is so directed . . .

And now, July 26, 1962, the account is confirmed nisi.